UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

KAREN WOODARD, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 03-2098

JAMES ANDRUS, ET AL.


**ORDER AND REASONS**

Before the Court are seven motions for summary judgment
filed by the defendants (R. Docs. 206, 207, 208, 211, 212, 216,
217) and six cross-motions for summary judgment filed by the
plaintiffs (R. Docs. 218, 219, 220, 221, 222, 223). As explained
below, the motions focus on whether the fees charged by Louisiana
clerks of court were authorized by state statute. In this
federal due process challenge, however, the contested state law
issues are irrelevant to the question of liability. The key
issue is whether the clerks provided the plaintiffs with
constitutionally adequate procedures, not whether the clerks
followed state law. If the plaintiffs are able to establish
liability, they will be entitled to nominal damages regardless of
whether they can show that any of the fees violated state law.
As for the constitutional adequacy of the clerks' procedures, the

Court finds that the plaintiffs's motions must be DENIED and that more briefing will be required before the Court will be able to rule on the defendants' motions.

## I.   BACKGROUND AND PROCEDURAL HISTORY

This case presents a constitutional challenge to the fee collection procedures used by the clerks of court in each of Louisiana's sixty-four parishes. The clerks of court are elected officers in Louisiana with duties relating to the administration of the district courts and the recording of legal documents. *See* LA. CONST. art. V, § 28; LA. REV. STAT. § 13:751, *et seq*. They are authorized by law to collect certain enumerated fees for their services, *see* LA. REV. STAT. §§ 13:841-50, which are then deposited into a fund that is used to defray the costs of the clerks' salaries and the capital and administrative expenditures of their offices, *see* LA. REV. STAT. §§ 13:781-87. When a lawsuit is initiated, the clerks are required to collect an advance deposit from the plaintiff, "to be disbursed to the clerk's salary fund or to others as their fees accrue." LA. REV. STAT. § 13:842. If the money in the plaintiff's deposit account is exhausted, "the clerk may refuse to perform any further function in the proceeding until the additional costs for the function have been paid ... ." *Id.* Finally, "[w]ithin 120 days after the final termination of the suit, the clerk shall either issue a

refund to the plaintiff of any unused amount remaining in the cost advance or issue a demand for payment to the 'party primarily liable' for any amount in excess of the cost advance." *Meyers v. Basso*, 398 So. 2d 1026, 1028 (La. 1981); *see also* LA. REV. STAT. § 13:843.1.

The Clerk of Court for Orleans Parish is governed by a separate statute, *see* LA. REV. STAT. § 13:1211, *et seq.*, but the fees and procedures are similar to those described above. It should also be noted that the citations to the Louisiana Revised Statutes in this opinion refer to the laws in effect at the time the challenged activities took place. The Louisiana legislature has since amended many of the relevant provisions, and the fee schedule has been greatly simplified.

The named plaintiffs in this case were separately involved in litigation in the Louisiana district courts, and they paid fees to the clerks of court in the manner described above. For example, plaintiff Billy Herrmann filed an action in the First Judicial District Court, Caddo Parish, in 2005. (*See* R. Doc. 206-3 at 24.) Defendant Gary Loftin, Clerk of Court for Caddo Parish, collected an advance deposit of $550 from Herrmann. (*See id.*) As the clerk's office performed various services, Loftin deducted fees for those services from Herrmann's deposit account. (*See id.* at 24-25) Herrmann apparently settled his lawsuit in 2006, and Loftin refunded the balance of his account, $184.93,

shortly thereafter. (*See id.* at 25.)

The present action challenges the fees charged by the clerks and the procedures used to collect them. Plaintiff Karen Woodard filed the original complaint in the U.S. District Court for the Western District of Louisiana in 2003, alleging that defendant James Andrus, Clerk of Court for Calcasieu Parish, had charged her, and others similarly situated, court fees that were unauthorized by state law. (*See* Woodard Compl., R. Doc. 1 at ¶ 25.) As amended, Woodard's complaint alleged that Andrus had violated her constitutional right of access to courts, had denied her the equal protection of the laws, and had deprived her of property without due process of law, all in violation of 42 U.S.C. § 1983. (*See id.* at ¶¶ 1, 31; Woodard Amend. Compl., R. Doc. 27 at ¶¶ 31.1, 36.12.) Andrus filed a motion to dismiss for failure to state a claim, which the district court granted in all respects. On appeal, the Fifth Circuit upheld the district court's dismissal of Woodard's equal protection and access to courts claims, but found that she had stated a valid due process claim under § 1983. *See Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005). This last holding is discussed in greater detail below. *See infra.*

Shortly after Woodard's case was remanded to the Western District of Louisiana, plaintiff Della Gastzke and eleven other individuals filed a similar putative class action in the U.S.

-4-

District Court for the Middle District of Louisiana. The Gastzke complaint alleged that the clerks of court for each of the sixty-four parishes in Louisiana had deprived the plaintiffs, and others similarly situated, of their property without due process of law, all in violation of 42 U.S.C. § 1983. (*See* Gastzke Compl., W.D. La. Civ. No. 06-0257, R. Doc. 1 at ¶ 4.) The Gastzke plaintiffs also alleged that the Louisiana Clerks of Court Association "acted in concert with the various Clerks of Court" to violate the plaintiffs' due process rights by "formulating, promulgating, implementing and overseeing the application of official policies which have resulted in a systematic overcharging of fees in civil litigation." (*See id.*) *Gastzke* and *Woodard* were subsequently consolidated into a single case in the Western District of Louisiana.

On December 20, 2006, the district court granted two motions for partial summary judgment filed by the defendants. First, the court found that a number of the plaintiffs' claims had prescribed by the time the suit was filed. (*See* R. Doc. 98 at 10.) The court dismissed the plaintiffs who had asserted only prescribed claims. (*See id.* at 7 n.1.) Second, the court held that the plaintiffs were not entitled to punitive damages in a section 1983 action against public officials. (*See id.* at 9-10.) The plaintiffs appealed, and the Fifth Circuit upheld both rulings. *See Woodard v. Jones*, 247 Fed. Appx. 494 (5th Cir.

-5-

2007) (per curiam).

On January 2, 2008, the consolidated *Woodard* case, which had eight plaintiffs remaining, was transferred to this Court. The defendants have filed seven new motions for summary judgment seeking dismissal of most of the plaintiffs' claims. The defendants argue that they cannot be held liable for charging fees authorized by state law, and that the claims based on authorized charges must therefore be dismissed. In the defendants' view, the majority of the claims against the clerks of court for Caddo (R. Doc. 206), Tangipahoa (R. Doc. 207), Iberville (R. Doc. 208), East Baton Rouge (R. Doc. 211), Beauregard (R. Doc. 212), Jefferson (R. Doc. 216), and Calcasieu (R. Doc. 217) parishes must be dismissed on this basis. The plaintiffs, in turn, have filed six cross-motions for summary judgment, in which they argue that judgment should be granted in their favor with respect to the unauthorized charges by the clerks of court for East Baton Rouge (R. Doc. 218), Beauregard (R. Doc. 219), Calcasieu (R. Doc. 220), Iberville (R. Doc. 221), Tangipahoa (R. Doc. 222), and Jefferson (R. Doc. 223) parishes.

The Court heard oral argument on November 5, 2008. At the argument, it became clear that the motions for summary judgment were focused on the wrong issues. The Court therefore ordered the parties to submit supplemental memoranda addressing the nature of the alleged Due Process violations. (*See* R. Doc. 321

-6-

at 1-2.)  The Court also ordered the parties to submit a joint
stipulation detailing which of the fees charged to the named
plaintiffs are in dispute.  (*See id.* at 3-4.)  The parties have
now submitted all of the requested documents (*see* R. Docs. 325-
27, 331, 333, 336), and the Court rules as follows.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there are no genuine
issues as to any material facts, and the moving party is entitled
to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c);
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court
must be satisfied that no reasonable trier of fact could find for
the nonmoving party or, in other words, "that the evidence
favoring the nonmoving party is insufficient to enable a
reasonable jury to return a verdict in her favor."  *Lavespere v.
Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.
1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249
(1986)).  The moving party bears the burden of establishing that
there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by pointing out that the evidence in the
record contains insufficient proof concerning an essential
element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at

325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.  *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## III. DISCUSSION

As noted at the outset, the plaintiffs allege that the clerks of court deprived them of their property without due process of law, all in violation of 42 U.S.C. § 1983.  The claim centers around allegations that the clerks charged fees that were unauthorized by the Louisiana civil fee statute, which provides that "[t]he clerks of the several district courts shall be entitled to demand and receive [seventy-seven enumerated] fees of office *and no more* in civil matters."  LA. REV. STAT. § 13:841 (emphasis added).  All parties agree that this statute restricts the types of fees that may be charged and sets a maximum allowable fee per chargeable activity.  The parties also agree that the statute permits the clerks to demand an amount less than the statutory maximum for any given chargeable activity.  The plaintiffs allege that the clerks charged court fees that were unauthorized by this statute or in excess of the amount specified

in the statute.  It appears from the record that at least some of the fees charged by the clerks were likely in excess of the statutory amount.  (*See, e.g.,* R. Doc. 230 at 4 (arguing that overcharges were proper in light of undercharges in other instances).)

Of course, even assuming that the defendants have violated the law, the plaintiffs must do more than demonstrate that the defendants violated a state statute if they are to prevail under section 1983.  As the Fifth Circuit recognized in this case, "a violation of a state statute alone is not cognizable under § 1983 because § 1983 is only a remedy for violations of federal statutory and constitutional rights."  *Woodard*, 419 F.3d at 353; *see also Rector v. Denver*, 348 F.3d 935, 947 (10th Cir. 2003) (McConnell, J.) ("It is well-established ... that a state's violation of its own laws does not create a claim under § 1983). *Cf. Screws v. United States*, 325 U.S. 91, 108 (1945) (holding that the criminal version of section 1983, now codified at 18 U.S.C. § 242, "does not come into play merely because the federal law or the state law under which the officer purports to act is violated"; rather, it "is applicable when and only when some one is deprived of a federal right by that action").  The question at the heart of the plaintiffs' claim is thus whether the clerks' actions violated the Due Process Clause of the Fourteenth Amendment, not whether they violated the Louisiana fee statute.

Although the alleged state law violations are not irrelevant, *see infra*, they do not play the central role that the parties seem to assume.

Section one of the Fourteenth Amendment provides, in relevant part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  The core idea captured by this command, which was prominently expressed in the Magna Carta of King John, *see* Charles Shattuck, The True Meaning of the Term "Liberty," 4 HARV. L. REV. 365, 369 (1891), is that governments and public officials should deploy their coercive powers according to rules and reason rather than passion and whim.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) ("[T]he touchstone of due process is protection of the individual against arbitrary action of government ... ."  ); *Bank of Columbia v. Okely*, 17 U.S. 235, 244 (1814) ("As to the words from Magna Charta, ... the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.").

This constitutional prohibition against arbitrariness has two facets.  First, the states must follow fair procedures before depriving someone of his life, liberty, or property.  Ordinarily,

this requires that the affected individual be given notice of the anticipated deprivation and a fair opportunity to challenge its propriety. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Second, the Due Process Clause prohibits certain egregious deprivations of life, liberty, and property irrespective of what procedures are followed. This "substantive" aspect of the clause guards against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 846; *see also* Richard H. Fallon, Jr., Some Confusions about Due Process, Judicial Review, and Constitutional Remedies, 93 COLUM. L. REV. 309, 310 (1993) ("[T]he intuitive idea [of substantive due process] is not mysterious: government officials must act on public spirited rather than self-interested or invidious motivations, and there must be a 'rational' or reasonable relationship between government's ends and its means."). The clause applies in this sense to both legislation, *see, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479 (1965) (law banning the use of contraceptives), and executive action, *see, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (criminal suspect's stomach forcibly pumped in order to obtain evidence).

The plaintiffs argue that the clerks' actions violate both components of the Due Process Clause. The Court will discuss each argument, beginning with substantive due process.

### A.    Substantive Due Process

The plaintiffs' substantive due process argument is easily dismissed.  When a "specific act of a governmental officer" is challenged, as here, the courts must ask "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[1] *Lewis*, 523 U.S. at 846, 847 n.8; *see also McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002) (en banc).  Only conscience shocking behavior rises to the level of a substantive due process violation.

Although "the measure of what is conscience shocking is no calibrated yard stick," *Lewis*, 523 U.S. at 847, the benchmarks laid down by the Supreme Court in this area provide sufficient guidance.  The Court has tied "the constitutional concept of conscience shocking" to the defendant's mental state, explaining that traditional tort law concepts of culpability provide useful guideposts.  *Id.* at 848.  On the one hand, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849; *see also McClendon*, 305 F.3d at 326.  On the other hand, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking

---

[1] The inquiry is different when legislation is challenged. *See Lewis*, 523 U.S. at 846.

level." *Lewis*, 523 U.S. at 849.

Here, plaintiffs argue that the clerks "deliberately departed from the clear language of the statute which set the guidelines for assessing fees ... ." (R. Doc. 325 at 5.) Even if the Court were to assume that a deprivation of property in deliberate violation of state law constitutes conscience-shocking behavior,[2] the plaintiffs' claim must be rejected because they have submitted absolutely no evidence to suggest that the clerks intended to violate the fee statute. Indeed, the plaintiffs alleged only a knowing violation of state law in the complaints. (*See* Woodard Compl., R. Doc. 1 at ¶ 33 (alleging that the defendants "knew or should have known" that their actions violated state law; Gastzke Compl., W.D. La. Civ. No. 06-0257, R. Doc. 1 at ¶ 32 (alleging that the defendants "acted in clear and knowing violation" of state law).) Absent any evidence of an intent to injure, or at least deliberate indifference to the plaintiffs' injuries, the Court cannot say that there is a genuine issue of material fact with respect to whether the defendants' conduct shocks the conscience. The defendants' motions for summary judgment must therefore be granted as to the plaintiffs' substantive due process claim.

---

[2] The Fifth Circuit's case law suggests that it might not. *See Marco Outdoor Advertising v. Regional Transit Authority*, 489 F.3d 669, 672 n.3 (5th Cir. 2007) (holding that a state agency's deprivation of property in knowing violation of state law was not so arbitrary as to shock the conscience).

**B.    Procedural Due Process**

The plaintiffs' more promising argument sounds in procedural due process.  They claim that the clerks deprived them of their property without complying with the fair procedures that are mandated by the Due Process Clause.  Before going into the details of this claim, it will be helpful to clarify the principles of procedural due process.  As the name implies, procedural due process is primarily concerned with procedures rather than outcomes.  Nevertheless, the purpose of guaranteeing fair procedures is "not only to ensure abstract fair play to the individual." *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972).  The procedures are deployed in protection of particular interests-- "life, liberty, [and] property"--and they serve "to *minimize* substantively unfair or mistaken deprivations" of those interests.  *Id.* at 81 (emphasis added); *see also Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.").  Thus, while the procedural aspect of the Due Process Clause does not categorically bar wrongful deprivations of life, liberty, and property, it seeks to minimize the frequency of such deprivations by mandating that *all* government deprivations be attended by fair procedures.

There are three principal elements to any procedural due

process claim: the plaintiff must demonstrate that a state actor (1) deprived him (2) of life, liberty, or property (3) without due process of law.[3]  The first element limits the coverage of the Due Process Clause to losses that arise out of coercive and culpable state conduct.  For example, when an individual knowingly and voluntarily relinquishes a protected interest to a state actor, there has been no "deprivation" that might implicate the Fourteenth Amendment.  *See Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167 (4th Cir. 1988).  Similarly, a "negligent act that causes unintended injury to a person's property does not 'deprive' that person of property within the meaning of the Due Process Clause." *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 645 (1999) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

The second element goes to the object of the protections afforded by the Due Process Clause.  It is only when the state deprives an individual of a "protected interest"--that is, "life, liberty, or property"--that fair procedures are constitutionally mandated.  *See, e.g.*, *Bishop v. Wood*, 426 U.S. 341, 347-50 (1976) (affirming summary judgment for defendants because plaintiff had failed to show a deprivation of a cognizable liberty or property

---

[3] When the plaintiff seeks a remedy for the violation through section 1983, he must satisfy the additional requirements imposed by that statute.

interest).  When, as here, an individual is allegedly deprived of

his property, the courts must typically look to state law to

determine whether the affected interests is in fact "property."

*See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538

(1985) ("Property interests are not created by the Constitution,

'they are created and their dimensions are defined by existing

rules or understandings that stem from an independent source such

as state law ... .'") (quoting *Bd. of Regents v. Roth*, 408 U.S.

564, 577 (1972)).  Although this inquiry is necessarily case-

specific, the Supreme Court has emphasized that "[t]he hallmark

of property ... is an individual entitlement grounded in state

law, which cannot be removed except 'for cause.'"  *Logan v.

Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (quoting *Memphis

Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978)).

The third element relates to the constitutionally required

procedures that must attend any deprivation of life, liberty, or

property.  As the Supreme Court has noted, "the deprivation by

state action of a constitutionally protected interest in 'life,

liberty, or property' is not in itself unconstitutional; what is

unconstitutional is the deprivation of such an interest *without

due process of law*."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)

(emphasis in original).  In determining whether an individual's

due process rights have been violated, the courts must therefore

ask "what process is due."  *Morrissey v. Brewer*, 408 U.S. 471,

481 (1972). The answer to this question is context-dependent. "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"; rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal citations and quotation marks omitted).

In ascertaining what procedures must be provided in a given situation, courts typically apply the famous balancing test announced in *Mathews v. Eldridge*, which requires consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335; *see also Wilkinson v. Austin*, 545 U.S. 209, 225 (2005); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). The Supreme Court has noted, however, that *Mathews v. Eldridge* is not "an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002). In certain instances, courts must apply a specific standard rather than the general *Mathews* balancing test. For example, before a state actor deprives an individual of a protected interest, he must provide notice "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). After applying the appropriate test, the court can judge whether the state-provided process was constitutionally sufficient. If it was not, and if the other two requirements are met, then the state has acted in violation of the Due Process Clause, and the aggrieved party has a remedy through section 1983.

Of course, even if a defendant is found liable for its unconstitutional conduct, there will still be a question of how to measure the plaintiff's damages. Courts start from the premise that the "basic purpose" of damages in a 1983 case is to "*compensate persons for injuries* that are caused by the deprivation of constitutional rights." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)). To that end, "no compensatory damages may be awarded in a § 1983 suit absent proof of actual injury." *Farrar v. Hobby*, 506 U.S. 103, 112 (1992). As in a typical tort suit, this proof has two components: proof of an injury and proof of a causal link between the defendant's unlawful conduct and the injury. Causation can be particularly difficult to prove in actions alleging due process violations because the plaintiff must demonstrate that his injuries would

not have occurred but for the defendant's failure to provide proper procedures. If the deprivation would have occurred despite the extra process--in other words, if the deprivation was *justified*--the plaintiff is entitled only to nominal damages. *See Carey*, 435 U.S. at 266-67 ("[I]f, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar from petitioners."); *Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004) ("[W]hen a defendant has deprived the plaintiff of liberty or property without affording him a hearing as required by the Due Process Clause, but the defendant proves that the adverse action would have been taken even if a proper and timely hearing had been held, the plaintiff has not proved compensable injury and is entitled only to nominal damages.").

To make the foregoing points more concrete, the plaintiffs must establish each of the following elements by a preponderance of the evidence in order to prevail on their procedural due process claims:

    (1) that they had a protected interest in the pre-paid court deposits;

    (2) that the defendants deprived them of that interest;

    (3) that the defendants did not provide constitutionally adequate procedures; and

    (4) that the defendants acted under color of state law.

The plaintiffs will be entitled to at least one dollar in nominal damages for each denial of due process that they are able to prove. If they can further establish that a given deprivation caused them actual injury, in that they were charged fees not authorized by state law, they will be entitled to compensation for that injury. In other words, the plaintiffs will be entitled to recover the value of each fee that they can prove was (1) taken in violation of section 1983 and the Due Process Clause, and (2) taken in violation of Louisiana law.

### i. Fifth Circuit Mandate

With the basic features of the due process analysis in mind, the Court now turns to the plaintiffs' due process claims against the clerks. In their verified complaint, the plaintiffs alleged that the clerks charged them fees in violation of state law. Although this conduct is not itself unconstitutional, *see Woodard*, 419 F.3d at 353, the plaintiffs further alleged that "[n]either [they] nor any other civil litigant was or is accorded an opportunity or procedure under state law or otherwise to contest or dispute these unlawful charges." (Woodard Amend. Compl., R. Doc. 27 at ¶ 36.7; *see also* Gastzke Compl., W.D. La. Civ. No. 06-0257, R. Doc. 1 at ¶ 37 (same).)

The legal sufficiency of the plaintiffs' procedural due process allegations has been tested already. The district court

originally dismissed Karen Woodard's complaint for failure to state a claim upon which relief can be granted (*see* R. Doc. 31), but the Fifth Circuit reversed, holding that "Woodard's well pleaded allegation[s] establish that she was deprived of a property right without due process of law." *Woodard*, 419 F.3d at 354. This Court is of course bound to "implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *See General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (quoting *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir.2002)). But because the Fifth Circuit necessarily considered only the well-pleaded allegations in the complaint, *see Woodard*, 419 F.3d at 351, the fuller factual record on summary judgment may affect this Court's implementation of the appellate mandate. *See* Wright, et al., 18B Federal Practice & Procedure: Jurisdiction § 4478.3 (2d ed. 2002 & Supp. 2008).

The Fifth Circuit's opinion is clear in some respects and not so clear in others. Its conclusion is clear: Woodard's complaint stated a valid due process claim. *See Woodard*, 419 F.3d at 354. As to the first two elements of the due process claim--the existence of a protected interest and the state's deprivation thereof--the Fifth Circuit held:

> [U]nder Louisiana state law, money is property that cannot be deprived by the state absent due process. *State v. Spooner*, 520 So. 2d 336 (La. 1988). Here, the disputed fees were drawn from a fund that Woodard was required to deposit

with the court in advance and have already been confiscated
by the Clerk of Court.  Woodard's well pleaded allegation[s]
establish that she was deprived of a property right without
due process of law.

*Id*.  The upshot of this holding is that the clerks effected a

deprivation of the plaintiffs' property each time they withdrew

money from the prepaid account.

The Fifth Circuit's assessment of the third element--what

process was due--must be understood in context.  The district

court had dismissed Woodard's due process claim based solely on

the "*Parratt/Hudson* doctrine," which relates to the timing of the

procedures required by the Fourteenth Amendment.[4]  As the Fifth

Circuit later explained, the *Parratt/Hudson* doctrine provides

that "a state actor's random and unauthorized deprivation of a

plaintiff's property does not result in a violation of procedural

due process rights if the state provides an adequate post-

deprivation remedy."  *Woodard*, 419 F.3d at 351.  The doctrine is

an exception to the rule that constitutionally required

procedures must generally *precede* the deprivation of a protected

interest.  The exception is justified because a state cannot

reasonably be expected to "provide pre-deprivation process in

situations where it cannot anticipate the need for such process,"

---

[4] The doctrine derives its name from two Supreme Court cases
dealing with the unauthorized destruction of prisoners' property
by prison officials.  *See Parratt v. Taylor*, 451 U.S. 527 (1981)
(prisoner's property negligently lost by prison official); *Hudson
v. Palmer*, 468 U.S. 517 (1984) (prisoner's property intentionally
destroyed by prison official).

as is the case when "the actions complained about are random and unauthorized." *Id.* (quoting *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996)); *see also Parratt*, 451 U.S. at 541 ("It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.").

The district court found that the *Parratt/Hudson* doctrine applied to Woodard's case because she had "meaningful post-deprivation remedies available." (R. Doc. 30 at 4.) For example, she was "not prohibited from filing a writ of mandamus seeking Defendant's compliance" with the fee statute. (*Id.*) Without fuller elaboration, and without explaining why the challenged charges were random and unauthorized, the court summarily concluded that the "[d]efendant's alleged action does not rise to the level of a Due Process Violation." (*Id.* at 4.)

The Fifth Circuit reversed on appeal. *See Woodard*, 419 F.3d at 353. Looking to the allegations in the complaint, the court found that it was "the custom or policy of Calcasieu Parish to charge fees in excess of, or not authorized by state statute." *Id.* at 353. In such circumstances, "the *Parratt/Hudson* doctrine is inapposite" because "actions in accordance with an 'official policy' ... can hardly be labeled 'random and unauthorized.'" *Id.* (quoting *Brooks*, 84 F.3d at 165). The district court therefore "erred in applying the *Parratt/Hudson* doctrine" because

the defendant's "actions were not random or unauthorized."[5]  *Id.*

It is not clear how far this holding extends.  The plaintiffs argue that the Fifth Circuit's rejection of the *Parratt/Hudson* doctrine completely bars this Court from considering post-deprivation remedies in the due process analysis.  (*See* R. Doc. 325 at 9.)  This view is not without support in the opinion.  After discussing the *Parratt/Hudson* doctrine at length, the Fifth Circuit held that "[b]ecause the *Parratt/Hudson* doctrine is inapposite, the discussion of the alleged availability of post-deprivation remedies, such as mandamus, is irrelevant." *Woodard*, 419 F.3d at 353.  Although the court did not elaborate, its statement could be read to imply that the *Parratt/Hudson* doctrine is the only exception to the general rule requiring pre-deprivation procedures.  In other words, the availability of post-deprivation remedies was irrelevant because only pre-deprivation procedures will satisfy the Due Process Clause when a deprivation is effected pursuant to state policy rather than by a rogue actor.

The Court rejects the plaintiffs' reading of the Fifth Circuit's statement as wholly inconsistent with over one hundred years of Supreme Court precedent.  Although the general rule is

_____

[5] Since the appeal, no evidence has been submitted to suggest that the disputed fees were actually random and unauthorized in the sense intended by the Fifth Circuit.  It is thus clear that the *Parratt/Hudson* doctrine does not apply to this case.

that constitutionally adequate procedures must precede a deprivation, *see Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950), the Supreme Court has long recognized that post-deprivation procedures may be adequate in some circumstances, even if the alleged deprivation cannot fairly be characterized as random and unauthorized. For example, the Supreme Court has held that pre-deprivation procedures are not required when time is of the essence, *see, e.g.*, *Barry v. Barchi*, 443 U.S. 55 (1979) (suspension of racetrack trainer on suspicion of horse drugging); *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950) (summary seizure and destruction of drugs); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 315 (1908) (summary seizure of unwholesome food), when the affected interest is subject to longstanding historical limitations, *see, e.g.*, *Ingraham v. Wright*, 430 U.S. 651 (1977) (corporal punishment of school children), or when the benefit of requiring pre-deprivation procedures would otherwise be substantially outweighed by the cost, *see, e.g.*, *City of Los Angeles v. David*, 538 U.S. 715 (2003) (fee for parking violation); *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) (withholding of payments due under state contract pending resolution of contract dispute); *Gilbert v. Homar*, 520 U.S. 924 (1997) (suspension without pay of state university employee); *Mackey v. Montrym*, 443 U.S. 1 (1979) (suspension of diver's license); *Mitchell v. W. T.*

*Grant Co.*, 416 U.S. 600 (1974) (prejudgment sequestration of disputed property). *See also Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."); *Loudermill*, 470 U.S. at 542 n.7 ("There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements."); *Parratt*, 451 U.S. at 538-39 ("[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process."); *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589 (1931) (Brandeis, J.) ("Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate."); *Coffin Brothers & Co. v. Bennett*, 277 U.S. 29 (1928) (Holmes, J.) (approving prejudgment attachment lien effected without notice or a hearing); *Lawton v. Steele*, 152 U.S. 133 (1894) (approving summary destruction of illegal fishing nets).

As these cases make clear, there is no unbending rule limiting the use of post-deprivation remedies to cases of random and unauthorized deprivations.  With the exceptions of *Parratt* and *Hudson*, the deprivations in the above-cited cases were all effected pursuant to law or official policy.  The *en banc* Fifth Circuit has also recognized that random, unauthorized deprivations are not the only situation in which post-deprivation remedies may be adequate.  *See Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) (*en banc*) (noting that "'the necessity of quick action by the State' justifies a summary deprivation followed by an adequate post-deprivation remedy"); *see also id.* ("*Ordinarily*, government may effect a deprivation only after it has accorded due process ... .") (emphasis added).

Rather, consistent with the flexible and context-sensitive nature of due process, *see Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162 (Frankfurter, J., concurring) ("'[D]ue process' cannot be imprisoned within the treacherous limits of any formula."), the courts in each case must engage in the familiar "analysis of the governmental and private interests that are affected" before ruling out the possibility that post-deprivation procedures will suffice.  *Mathews*, 424 U.S. at 334; *see also id.* at 333 ("The fundamental requirement of due process is the opportunity to be heard '*at a meaningful time* and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545,

552 (1965)) (emphasis added). When the nature of the deprivation and the affected interests would make it impracticable to provide pre-deprivation process, an adequate post-deprivation procedure may be all that is due. *See Parratt*, 451 U.S. at 538-39. Indeed, as the Supreme Court has emphasized, *Parratt* and *Hudson* themselves "represent a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon*, 494 U.S. at 128.

In light of this long and unbroken line of Supreme Court precedent, the Court declines to read the Fifth Circuit's brief and unexplained statement as a categorical bar to the consideration of post-deprivation remedies. The *Woodard* opinion is best read as a narrow rejection of the district court's *Parratt/Hudson* analysis and the defendant's *Parratt/Hudson* arguments, and not a broad ruling on the constitutional sufficiency of post-deprivation procedures. It would be a stretch to assume that the Fifth Circuit panel intended its ruling to extend beyond the particular issue of random and unauthorized deprivations, since the parties briefed only the applicability of the *Parratt/Hudson* doctrine on appeal, and did not address other situations in which post-deprivation procedures might be adequate. *See* Appellant Brief, 2004 WL 5544798 at *9-

*11; Appellee Brief, 2004 WL 5544797 at *14-*16; Appellant Reply, 2004 WL 5544796 at *4-*7.  Moreover, the appellate panel was not free on an appeal from a 12(b)(6) dismissal to initiate a broad-ranging inquiry into the sufficiency of the actual post-deprivation remedies provided by the clerks. The complaint alleged that "[n]either plaintiff nor any other civil litigant was or is accorded an opportunity or procedure under state law or otherwise to contest or dispute these unlawful charges" (Woodard Amend. Compl., R. Doc. 27 at ¶ 36.7), and the court was bound to accept the well-pleaded factual allegations in the complaint as true, *see Woodard*, 419 F.3d at 351.

Finally, the plaintiffs' proposed reading of the Fifth Circuit opinion would put the clerks in an impossible position. According to the plaintiffs' statistical information, over 55,000 civil cases are filed every year in the seven district courts corresponding to the eight named plaintiffs. (*See* R. Doc. 338 at 9-10.)  If the plaintiffs in this putative class action are indeed representative, the litigants in those cases will incur hundreds of charges throughout the course of their litigation. (*See* R. Docs. 331, 333, 336.)  It would border on the absurd to require the clerks to provide a hearing, or some other type of process, before assessing every one of these millions of charges, each of which is typically just a few dollars in amount. *Cf. David*, 538 U.S. at 718-19 ("[T]he Ninth Circuit's holding, which

-29-

presumably would require the city to schedule annually 1,000 or
more hearings ... within a 48-hour (or 5-day) time limit, will
prove burdensome."); *Zinermon*, 494 U.S. at 132 ("[I]n situations
where a predeprivation hearing is unduly burdensome in proportion
to the [protected] interest at stake ... postdeprivation remedies
might satisfy due process."). Nothing in the text or history of
the Due Process Clause requires this result, which is completely
disconnected from the ends to which the clause is directed. For
these reasons, the Court declines to read the Fifth Circuit's
opinion to imply that pre-deprivation remedies are required as a
matter of law in all cases where the *Parratt/Hudson* doctrine does
not apply.

It bears emphasis that this Court's recognition that post-
deprivation procedures *might* be constitutionally adequate does
not mean that any post-deprivation procedures *will* be adequate.
Although the circumstances may justify a departure from the
general rule of pre-deprivation process, meaningful procedures
must nevertheless be provided without undue expense, burden, or
delay. *Cf. Parratt*, 451 U.S. at 538-39 ("[E]ither the necessity
of quick action by the State or the impracticality of providing
any meaningful predeprivation process, when coupled with the
availability of *some meaningful means by which to assess the
propriety of the State's action at some time after the initial
taking*, can satisfy the requirements of procedural due process.")

(emphasis added); *Mackey*, 443 U.S. at 19 ("[T]he compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the *prompt postsuspension hearing* available.") (emphasis added). *Mathews v. Eldridge* provides the appropriate framework for judging the constitutional adequacy of the procedures.

> ### ii. Clerks' Motions for Summary Judgment

To be entitled to summary judgment, the defendants must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). As the moving parties, they "bear[] the initial responsibility of informing the district court of the basis for [their] motion[s], and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Russ v. International Paper Co.*, 943 F.2d 589, 591-92 (5th Cir. 1991). The defendants originally focused on the legality of the disputed charges under Louisiana law, arguing that they were entitled to judgment as a matter of law because all of the charges they assessed were authorized. As should be clear by now, however, the legality of the charges under state law does not foreclose

the clerks' liability under section 1983 because the plaintiffs may be entitled to nominal damages even if they cannot prove a violation of state law. *See Carey*, 435 U.S. at 266-67. The due process analysis turns on what *procedures* were afforded and whether those procedures were constitutionally adequate.

The parties have also suggested that the state law issues are relevant to the constitutional analysis because "the statute[] authorizing the Clerks to assess fees to a class of persons is sufficient to afford the Plaintiffs due process by way of legislative process" so long as the clerks "comply with the provisions of these statutes." (R. Doc. 325 at 6; *see also* R. Doc. 326 at 9 n.40.) But legislative determinations provide all the process that is due only when the resulting legislation *directly* effects a deprivation, such as when the legislature establishes a general tax or extinguishes a property right across the board. *See Atkins v. Parker*, 472 U.S. 115, 129-30 (1985); *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 443-46 (1915); *County Line Joint Venture v. City of Grand Prairie, Tex.*, 839 F.2d 1142, 1143-45 (5th Cir. 1988); *see also Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 8 (2003) (Scalia, J., concurring) ("[T]he categorical abrogation of [a] liberty interest by a validly enacted statute suffices to provide all the process that is 'due'--just as a state law providing that no one under the age of 16 may operate a motor vehicle suffices

-32-

to abrogate that liberty interest."). When a plaintiff
challenges an executive agent's application of the law to a
particular individual, additional procedures are required. *See
County Line Joint Venture*, 839 F.2d at 1144 (differentiating
between legislative and administrative deprivations); *see also
Bi-Metallic Inv. Co.*, 239 U.S. at 446; *Londoner v. Denver*, 210
U.S. 373, 385-86 (1908).

   Because the defendants' original summary judgment motions do
not attack an essential element of the plaintiffs' claims, *see
Celotex*, 477 U.S. at 322-23, or otherwise demonstrate that there
is no genuine issue of material fact, they fail to provide a
basis for entering judgment. The defendants' court-ordered
supplemental briefings are more helpful. The clerks argue that
they are entitled to summary judgment because they have provided
the plaintiffs with all the process that is due under the
circumstances. The clerks for five of the parishes have attached
the affidavits of Clerk's Office employees, who attest that
litigants and their attorneys are able to challenge the fees
assessed against them by calling the clerk's office. The
Director of Accounting for the Jefferson Parish Clerk of Court
further attests that her department reviews all charges at the
end of every business day, and automatically refunds any fees
that are found to be inaccurate. (*See* R. Doc. 327-2 at ¶¶ 5-11.)
According to the clerks, these procedures provide all the process

that is due.

The plaintiffs, who were ordered to file their supplemental memorandum before the defendants filed theirs (*see* R. Doc. 321), have not had an opportunity to rebut this factual showing; however, the Court finds that it is unnecessary for them to do so. Although none of the parties has mentioned it, the Court's research reveals that Louisiana law provides litigants with a second avenue for contesting court charges. The Louisiana Supreme Court has held that parties may seek a refund of the money owed to them by filing a post-trial or post-dismissal motion:

> [A] plaintiff may file a motion setting forth facts demonstrating that the civil suit has been finally terminated and praying that the court order the clerk to refund any unused deposit due within the period required by law. The court may grant the order ex parte if the mover is clearly entitled without supporting proof, or, if not, require that the motion be served on and tried contradictorily with the adverse party.

*Action Real Estate Ass'n v. Welborn*, 654 So.2d 680, 681 (La. 1995) (per curiam). The Louisiana Supreme Court did not explain whether the moving party may challenge the factual and legal basis of fees deducted from his account, but the Court has no reason to believe that a Louisiana court faced with such a motion would refuse to consider the parties' arguments.

The Court finds that this procedure is constitutionally sufficient as a matter of law. As noted, this determination requires weighing the *Mathews v. Eldridge* factors:

-34-

> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures used,
> and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute
> procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

With respect to the private interest, the sums of money involved are undoubtedly small when viewed in isolation. The disputed charges in Beauregard Parish, for example, range from $2.25 to $66.00. (*See* R. Doc. 331.) The charges can add up to a more substantial amount as a case progresses, but the plaintiffs' interest in amounts totaling several hundred to several thousand dollars remains relatively small. *Compare Hamdi*, 542 U.S. 507 (2004) (indefinite detention without charges); *Washington v. Harper*, 494 U.S. 210 (1990) (nonconsensual administration of antipsychotropic drugs); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (termination of welfare benefits). That said, *some* process is due whenever a state intends to deprive an individual of a protected interest, and the Supreme Court has found state procedures to be inadequate in cases involving similarly insubstantial private interests. *See, e.g., Fuentes,* 407 U.S. at 70, 96 (1972) (holding that replevin of stove and stereo worth $500 violated due process).

The second *Mathews* prong requires consideration of the risk of an erroneous deprivation under the current procedures and the

likely value of additional procedures.  Here, the risk of error

is relatively low.  As a general matter, few erroneous

deprivations are likely to occur in the context of administrative

fees assessed pursuant to a clear statutory scheme.  *See Sickles*

*v. Campbell County*, 501 F.3d 726, 730 (6th Cir. 2007) (finding

that "the risk of erroneous deprivation [was] minor" because the

withdrawal of funds from a prisoner's spending account "involves

elementary accounting that has little risk of error and is

non-discretionary").  As this case demonstrates, however, the

risk of systemic error increases as the clarity of the statute

decreases.  When, as here, the government agents are afforded a

significant amount of discretion in administering a complex,

vague statutory scheme that has never been definitively

construed, *see* La. Rev. Stat. §§ 13:841-50; *Meyers*, 398 So. 2d at

1028 (noting that "[t]he procedural scheme relative to the time

of and the responsibility for payment of the costs of the trial

court is not clearly defined"), there is a possibility that

errors will be made.

Nevertheless, the ability to seek a court-ordered refund

greatly reduces the risk of such error.  A litigant who believes

he has been short-changed by the clerks may petition the very

same judge who has been overseeing his case for a refund order.

Unlike mandamus, this is not an extraordinary remedy and does not

require the litigant to initiate a separate action.  Indeed, "if

the mover is clearly entitled [to a refund] without supporting proof," he may obtain an order *ex parte*.  *Welborn*, 654 So.2d at 681.  If there is a dispute as to the proper interpretation of the fee statutes, the moving party is entitled to a full hearing. *See id.*  Moreover, the motion may be filed as soon as the case has terminated.  Short of a pre-deprivation hearing before every charge, it is difficult to see what other process could be provided that would reduce the risk of error.  It is telling that the plaintiffs have not specified what process they believe is due.

Finally, the Court recognizes that Louisiana and the clerks have an interest in assessing fees to support the clerks' activities.  *See Broussard*, 318 F.3d at 656 (noting that "the government has an interest in continuing to assess [bail] fees to support its bail-bond system").

In view of the balance of interests, it is plain that a pre-deprivation hearing is not required before every charge is assessed.  As discussed, such a requirement would be impracticable given the number of charges assessed per year and unnecessary in light of the small amounts at stake.  Indeed, several courts of appeals have endorsed similar reasoning in the context of minor charges assessed to prison inmates' "canteen accounts."  *See Sickles*, 501 F.3d 726; *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243 (4th Cir. 2005); *Tillman v. Lebanon*

-37-

*County Correctional Facility*, 221 F.3d 410 (3d Cir. 2000).  Those

cases are remarkably similar to the present case, in that the

plaintiffs had alleged that small amounts of money were taken

from pre-paid accounts without due process of law.  The courts in

those cases found that a pre-deprivation hearing was not required

in light of the high cost and minimal benefit of requiring such

hearings.  The courts explicitly recognized that the prisoners

had a meaningful opportunity to be heard through the prisons'

administrative grievance systems.  *See Sickles*, 501 F.3d at 730-

32; *Slade*, 407 F.3d at 253-54 & n.9; *Tillman*, 221 F.3d at 421-22.

Similarly, in *City of Los Angeles v. David*, the Supreme

Court held that a hearing held 27 days after the municipal

government towed an individual's illegally parked vehicle

provided constitutionally sufficient process.  *See David*, 538

U.S. at 718.  The plaintiff in that case had recovered his car by

paying $134.50, so the deprivation at issue was the temporary

deprivation of the plaintiff's money pending the hearing.

Alluding to the minimal nature of the plaintiff's property

interest, the Court held: "Our cases make clear that the Due

Process Clause does not prohibit an agency from imposing [a 27

day] procedural delay when holding hearings to consider claims of

the kind here at issue."  *Id.* at 719.

In light of these cases, the Court finds that the refund

procedure described by the Louisiana Supreme Court passes the

*Mathews v. Eldridge* balancing test.  The ability to seek an order
from the judge presiding over the litigant's action provides
substantially more process than the informal procedures that are
typically required in cases involving small private interests.
Moreover, it is not unreasonable to require litigants to wait
until the end of a lawsuit to challenge the charges assessed
against their accounts.  As with the hearings in *David*, the delay
"reflects no more than a routine delay substantially required by
administrative needs."  538 U.S. at 719.  The clerks' work would
come to a standstill if litigants could initiate multiple fee
challenges during the course of a lawsuit.  For these reasons,
and because it is not clear what additional procedures could be
implemented that would provide plaintiffs with the process they
seek, the Court finds that the refund procedure described by the
Louisiana Supreme Court in *Action Real Estate Association v.
Welborn* provides all the process that is constitutionally due.

One final issue remains unresolved, however.  Due process
demands that individuals be given notice of an impending
deprivation as well as an opportunity to be heard.  As the
Supreme Court has recognized, the "right to be heard has little
reality or worth unless one is informed that the matter is
pending and can choose for himself whether to appear or default,
acquiesce or contest."  *Mullane*, 339 U.S. at 314.  Absent notice,
even the most robust refund procedures would be worthless because

aggrieved parties would never become aware that they have a
reason to use the procedures. Due process therefore requires
state actors who intend to effect a deprivation to provide notice
"reasonably calculated, under all the circumstances, to apprise
interested parties of the pendency of the action and afford them
an opportunity to present their objections." *Dusenbery*, 534 U.S.
at 168 (quoting *Mullane*, 339 U.S. at 314).

In this case, it does not appear from the record that the
plaintiffs had any way of knowing in advance what charges could
be deducted from their accounts. It does not appear that the
clerks posted a fee schedule or other listing of their charges.
Although the fee statute provides notice of the maximum possible
fee for each chargeable activity, it does not provide sufficient
notice of the actual fees because, as the parties agree, the
clerks are free to charge any amount within the allowed range.
*See* La. Rev. Stat. 13:841 ("The clerks of the several district
courts shall be entitled to demand and receive the following fees
of office and no more in civil matters ... ."); *see also*
Defendants' Motion for Summary Judgment for Calcasieu Parish, R.
Doc. 217-6 at 13 (arguing that "[t]here was no violation of law"
when the plaintiffs were "charged less than the allowable
statutory maximum"). In addition, it appears that some of the
clerks did not even inform litigants of what charges were
actually assessed against their accounts unless those litigants

specifically asked for a cost sheet. (*See, e.g.,* Bennett Aff.,
R. Doc. 212-2 at 1 ("Each cost sheet is generated by the
Beauregard Parish Clerk of Court's office, is maintained in the
normal course of business of the Beauregard Parish Clerk of
Court's office, and is available to each litigant *upon request*.")
(emphasis added).) Without advance notice of what charges would
be assessed for each activity and *ex post* notice of what charges
were actually assessed, it is difficult to see how the plaintiffs
could have been expected to use the refund procedures that were
provided for them.

Ultimately, the Court is unable to determine whether summary
judgment is appropriate because the parties have not briefed the
issue of notice. The Court will therefore defer its ruling on
whether there is a genuine issue of material fact as to whether
the clerks provided due process until after the parties have
mustered the relevant evidence.


### iii. Plaintiffs' Motions for Summary Judgment

Because the plaintiffs must ultimately prove every essential
element of their section 1983 claims, they bear a heavy burden on
summary judgment. At a bare minimum, they must submit sufficient
proof of each element for a reasonable jury to return a verdict
in their favor. The plaintiffs have fallen far short of that bar
here. Like the defendants, they have submitted motions for

summary judgment that are focused on the state law issues.  These motions do not even address the elements of a section 1983 claim. The supplemental briefing similarly fails to identify evidence that would support judgment for the plaintiffs.  For these reasons, the plaintiffs' motions for summary judgment must be denied.

### C.   *Pullman* Abstention

One final issue must be addressed.  Before oral argument, the Court ordered the parties to submit "supplemental memoranda addressing whether the doctrine of abstention announced in *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), is applicable to the present controversy."  (R. Doc. 295.)  All parties emphatically urged the court not to abstain so that the case can be resolved as speedily and efficiently as possible. (*See* R. Docs. 311, 312, 314.)

The Court agrees that abstention is unwarranted.  Even assuming that the formal requirements for abstention are met, *see Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Committee*, 283 F.3d 650, 653 (5th Cir. 2002), a court contemplating abstention must "assess the totality of the circumstances presented by [the] particular case, considering the rights at stake and the costs of delay pending state court adjudication."  *Baran v. Port of Beaumont Nav. Dist. of Jefferson*

*County Tex.*, 57 F.3d 436, 442 (5th Cir. 1995).  Here, the plaintiffs have pursued their constitutional claims in federal court for more than five years.  The Fifth Circuit has heard three appeals.  Until this Court ordered the supplemental briefing, there had been no suggestion that abstention might be appropriate.  It would be a waste of judicial resources and the parties' resources to require the parties to start anew in state court at this point.  For these reasons, the Court declines to abstain.


**IV.  CONCLUSION**

For the foregoing reasons, the plaintiffs' motions for summary judgment (R. Docs. 218, 219, 220, 221, 222, 223) are DENIED.

As to the defendants' motions for summary judgment, IT IS ORDERED that the plaintiffs shall submit no later than 2:00 p.m. on MONDAY, JANUARY 26, 2009, a supplemental memorandum addressing whether constitutionally adequate notice was provided by the clerks.  The memorandum shall be divided into sections corresponding to each of the seven clerks of court whose actions are currently at issue.  Each section shall refer to specific evidence, either currently in the record or attached to the supplemental memorandum, that bears on what notice was provided to the plaintiffs and whether that notice was sufficient under

the standard described in *Dusenbery v. United States*, 534 U.S. 161 (2002) and related cases. The memorandum shall also assess whether summary judgment is appropriate in light of the legal standards discussed in this order and the evidence on record. The memorandum shall not exceed thirty pages, exclusive of any pages containing a table of contents or a table of authorities.

IT IS FURTHER ORDERED that the defendants shall submit no later than 2:00 p.m. on MONDAY, FEBRUARY 2, 2009, a memorandum of not more than thirty pages in response to the plaintiffs' supplemental memorandum. Counsel for Jon Gegenheimer shall work with counsel for the other clerks to integrate the separate sections into a single memorandum.

IT IS FURTHER ORDERED that the plaintiffs may file a reply memorandum no later than 2:00 p.m. on THURSDAY, FEBRUARY 5, 2009.

New Orleans, Louisiana, this 15th day of January, 2009.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE