UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

KAREN WOODARD, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 03-2098

JAMES ANDRUS, ET AL.


**ORDER AND REASONS**

Before the Court is plaintiffs' motion for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure.[1]  Because plaintiffs have not met their burden of establishing that the proposed class meets the predominance and superiority requirements of that rule, plaintiffs' motion is DENIED.


**I.    BACKGROUND**

As the Court has issued a number of orders in this case, the

---

[1]      (R. Doc. 579.)

background will be summarized only briefly.[2]  This case presents
challenges to the fee-collection procedures used by the clerks of
court in Louisiana parishes.  The clerks of court are elected
officers in Louisiana with duties relating to the administration
of the district courts and the recording of legal documents.  *See*
La. Const. art. V, § 28; La. Rev. Stat. § 13:751, *et seq*.  Under
a statute in effect at the relevant time, the clerks were
authorized to collect 77 different fees for their services to
litigants in state-court lawsuits.[3]  The statute specified that
"[t]he clerks of the several district courts shall be entitled to
demand and receive [these 77 fees] of office *and no more* in civil
matters."[4]  The statute supplied a specific maximum charge that
the clerks could "demand and receive" for each service.  For
example, "[f]or endorsing, registering, and filing [a] petition,"
the clerks could charge two dollars.  La. Rev. Stat.

_____

[2]     A more extensive background may be found at R. Doc.
360, which is also reported as *Woodard v. Andrus*, 649 F. Supp. 2d
496 (W.D. La. 2009).

[3]     The specific statute detailing the 77 enumerated fees
that could be charged by the clerks of court, La. Rev. Stat.
§ 13:841, has been amended since the conduct described in
plaintiffs' complaint took place.  *See* 2006 La. Sess. Law Serv.
Act. No. 243.  Unless otherwise specified, all citations to
Louisiana statutes are to the pre-2006 statutes in effect at the
time of the challenged conduct.

[4]  La. Rev. Stat. § 13:841(A).

§ 13:841(A)(1).  But this two-dollar charge was a maximum, and the clerks were entitled to charge less than that amount.  *Id.* § 13:841(A) (emphasis added).  These fees were then placed into a fund that was used to defray the costs of the clerks' salaries and the capital and administrative expenditures of their offices. *See* La. Rev. Stat. §§ 13:841-50, 13:781-87.

When a litigant initiated a lawsuit in state court, the clerks were required to collect an advance deposit from the plaintiff, "to be disbursed to the clerk's salary fund or to others as their fees accrue."  La. Rev. Stat. § 13:842; *see also City of Monroe v. Lolley*, 660 So. 2d 94, 97 (La. Ct. App. 1995). If the money in the plaintiff's deposit account was exhausted, the clerk could "refuse to perform any further function in the proceeding until the additional costs for the function have been paid."  La. Rev. Stat. § 13:842.  Finally, "[w]ithin 120 days after the final termination of the suit," the clerk was required to "either issue a refund to the plaintiff of any unused amount remaining in the cost advance or issue a demand for payment to the 'party primarily liable' for any amount in excess of the cost advance."  *Meyers v. Basso*, 398 So. 2d 1026, 1028 (La. 1981); *see also* La. Rev. Stat. § 13:843.1.  The statutory structure of the clerks' fee-collection procedures thus contemplated that a litigant would provide an advance deposit of a certain amount to

3

a clerk's office, and from that advance deposit actual charges
for services would be deducted.  The refund procedure indicates
that the actual charges assessed against the litigants could be
less than the amount of the advanced deposit.

The named plaintiffs in this case were separately involved
in litigation in the Louisiana district courts, and they paid
fees to the clerks of court in the manner described above.  The
present consolidated action alleges that the clerks of court in
Louisiana parishes assessed actual charges against plaintiffs
that were not authorized by Louisiana statute, or that the fees
were in excess of those allowed by statute.  For example, the fee
statute authorized a three-dollar charge for "issuing [a]
subpoena duces tecum, with seal" and a two-dollar charge for
"issuing [a] copy of subpoena duces tecum, with seal and
certificate." La. Rev. Stat. § 13:841(A)(24)-(25).  Della Gatzke,
a named plaintiff who was a litigant in East Baton Rouge Parish,
was charged $14.53 for the issuance of a subpoena duces tecum and
subpoena for deposition in 2004.[5]  As another example, Gatzke was
charged $26.60 for filing a pretrial order the previous year.[6]
The fee statute, however, makes no explicit mention of pretrial

---

[5]    (R. Doc. 331-14 at 5.)

[6]    (*Id.*)

4

orders.  Plaintiffs thus claim that the clerks' actual practices bore little relationship to the amounts legally authorized by the fee statute.  Defendants claim that they actually had statutory authority to make these charges because other sections of the statute allowed assessment of fees for "recording" and "copying."[7]

This litigation has been ongoing since November of 2003. The case originally focused primarily on plaintiffs' federal claims under 42 U.S.C. § 1983.  In July 2005, the Fifth Circuit held that plaintiffs had adequately pleaded a violation of the Due Process Clause.[8]  After considerable motion practice, this Court determined that plaintiffs' only viable due-process challenge was predicated on the argument that they did not receive constitutionally adequate notice of fees assessed against them in their state-court suits.[9]  In May 2010, after further development of the record, the Court granted summary judgment for the defendants on plaintiffs' due process claims.[10]  The Court ruled that the information supplied by the clerks, combined with

---

[7]    (*See, e.g.,* R. Doc. 386-1 at 8, 17-18.)

[8]    *Woodard v. Andrus*, 419 F.3d 348, 354 (5th Cir. 2005).

[9]    (R. Doc. 360.)

[10]    (R. Doc. 508.)

the information that is freely available in the Louisiana statutes and case law, provides reasonably adequate notice to a litigant of the charges against him or her such that the litigant can prepare for and take advantage of a post-deprivation hearing. The Court noted that in *Action Real Estate Ass'n v. Welborn*, 654 So.2d 680, 681 (La. 1995) (per curiam), the Louisiana Supreme Court ruled that a litigant may file a motion under La. Rev. Stat. § 13:843.1 to recover any unused deposits retained by the clerks.  The Court ruled that plaintiffs had adequate notice to take advantage of this post-deprivation remedy, and thus plaintiffs could not maintain their due process claims.

The Court dismissed plaintiffs' federal claims, but it did not dispose of their state law claims.  On August 12, 2010, the Court ruled that plaintiffs' complaints mention at least two state law claims: conversion and breach of fiduciary duty.[11]  The Court then ruled that it would exercise supplemental jurisdiction over plaintiffs' state law claims.[12]

Relying on Rule 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs now propose to certify the following

---

[11]   (R. Doc. 518.)

[12]   (R. Doc. 523.)

6

class:[13]

> All civil litigants in state district court proceedings in
> Calcasieu Parish from November 13, 1992 to August 15, 2006
> or in state district court proceedings in Beauregard Parish,
> Caddo Parish, East Baton Rouge Parish, Iberville Parish,
> Jefferson Parish or Tangipahoa Parish from September 22,
> 1995 to August 15, 2006 and who paid or were assessed court
> costs accrued during those periods.[14]

Plaintiffs propose to divide the proposed class into the

following seven subclasses:[15]

> (1)  Calcasieu Parish Subclass:  All members of the proposed
>      class of civil litigants in Calcasieu Parish from
>      November 13, 1992 to August 15, 2006.

> (2)  Beauregard Parish Subclass:  All members of the
>      proposed class of civil litigants in Beauregard Parish
>      from September 22, 1995 to August 15, 2006.

> (3)  Caddo Parish Subclass:  All members of the proposed

---

[13]   This is effectively plaintiffs fifth motion for class
certification.  (R. Doc. 10; R. Doc. 338; R. Doc. 408; R. Doc.
486.)

[14]   (R. Doc. 579-1 at 1.)

[15]   Although plaintiffs' motion seeks certification of a
class involving litigants from seven parishes, plaintiffs'
lawyers have since informed the Court of their intent to settle
with the clerks in Jefferson and Caddo Parishes.  Yet, because
plaintiffs have neither filed a motion to dismiss their claims
against these parishes nor amended their motion for class
certification, the Court will address plaintiffs' motion as
filed.  The Court notes, however, that its conclusions would be
no different as to predominance, superiority, or the sufficiency
of notice if plaintiffs' motion were a proposal for a five-parish
class action.  While the class would be somewhat smaller in that
case, the magnitude of the reduction of potential class members
would not sufficiently offset the difficulties discussed in this
opinion.

class of civil litigants in Caddo Parish from September 22, 1995 to August 15, 2006.

(4)   East Baton Rouge Parish Subclass:  All members of the proposed subclass of civil litigants in East Baton Rouge Parish from September 22, 1995 to August 15, 2006.

(5)   Iberville Parish Subclass:  All members of the proposed class of civil litigants in Iberville Parish from September 22, 1995 to August 15, 2006.

(6)   Jefferson Parish Subclass:  All members of the proposed class of civil litigants in Jefferson Parish from September 22, 1995 to August 15, 2006.

(7)   Tangipahoa Parish Subclass:  All members of the proposed class of civil litigants in Tangipahoa Parish from September 22, 1995 to August 15, 2006.[16]

Plaintiffs also provide the following list of charges and related policies that they contend are at issue in this case:

(1)   Filing charges in excess of that allowed by La. R.S. 13:841(A)(1-4, 74)

(2)   Copying charges in excess of that allowed by La. R.S. 13:841(A)(5)

(3)   Citation Charges in excess of that allowed by La. R.S. 13:841(A)(6-7)

(4)   Subpoena and Subpoena Duces Tectum Charges in excess of that allowed by La. R.S. 13:841(24-27)

(5)   Minute Entry Charges in excess of that allowed by La. R.S. 13:841(42)

(6)   Recording charges made without authority or in excess of that allowed by La. R.S. 13:841(A)(62)

---

[16]   (*Id.* at 2.)

(7)   Certified Copy Charges made without any statutory authority or in excess of authority.

(8)   Conformed Copy Charges made without any statutory authority or in excess of authority.

(9)   Improper Calculation of increases allowed under La. R.S. 13:841(C) and/or (D)[17]

Defendants oppose class certification on several grounds. They argue that the proposed class cannot be certified because it ignores previous rulings on prescription, because it includes litigants who did not pay charges, and because it is ambiguous. Further, defendants argue that the named plaintiffs cannot meet the typicality or adequacy of representation requirements of Rule 23(a), and that plaintiffs cannot meet the predominance or superiority requirements of Rule 23(b)(3).

## II.   DISCUSSION

## A.   Elements and Standards of Rule 23

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  To be certified, the class must first satisfy the following threshold requirements of Rule 23(a): (1) a class "so numerous that joinder of all members is impracticable"; (2) the existence of "questions of law or fact common to the

---

[17]   (*Id.*)

class"; (3) class representatives with claims or defenses "typical . . . of the class"; and (4) class representatives that "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition, the class must satisfy one of the three subsections of Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification pursuant to Rule 23(b)(3).[18] Rule 23(b)(3) imposes two prerequisites, predominance and superiority: "questions of law or fact common to class members [must] predominate over any questions affecting only individual members, and . . . a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 615; *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). Rule 23(b)(3) also includes a non-exhaustive list of factors pertinent to findings of predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

_____

[18]    (R. Doc. 579-1 at 1.)

Fed. R. Civ. P. 23(b)(3).  Further, the Court must consider how the case would actually be tried as a class action to determine whether manageability problems prevent class litigation from being the superior mode of adjudication.  *Castano*, 84 F.3d at 740, 743-45.

As the party seeking class certification, plaintiffs bear the burden of showing that all of the criteria are met.  *See Unger*, 401 F.3d at 320.  Class certification is soundly within the district court's discretion, and the court "must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  "Rule 23 requires the Court to 'find,' not merely assume, the facts favoring class certification."  *Unger*, 401 F.3d at 321.  Although the class certification decision should not reach the merits of the plaintiffs' claims, *Castano*, 84 F.3d at 744, it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision, *id.*; *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 421-22 (5th Cir. 2004).

**B.   The Prerequisites of Rule 23(a)**

   1.   <u>Numerosity</u>

Rule 23(a)(1) simply requires that the class be so large that joinder of all members is impracticable.  The parties do not dispute numerosity, and there is no question that the proposed class could number in the thousands.  Accordingly, the Court finds that plaintiffs have satisfied the numerosity requirement.  *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (upholding the district court's finding of numerosity for a class that would likely consist of between 100 and 150 members).

2.  <u>Commonality</u>

The commonality test of Rule 23(a)(2) is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982).  Because of this minimal requirement, "[t]he threshold of commonality is not high." *Jenkins v. Raymark Inds., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).  In this case, there is at least one common issue that will affect a significant number of the putative class members, such as whether sections of the statute authorizing assessment of fees for "recording" and "copying" allow the imposition of fees above the amount specifically listed in the statute.  This finding does not, however, resolve the inquiry

12

under Rule 23(b)(3) as to whether common issues predominate over individual ones.

3.   <u>Typicality and Adequacy of Representation</u>

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  The test for typicality is not demanding, *Shipes v. Trinity Inds.*, 987 F.2d 311, 316 (5th Cir. 1993), and it focuses on the general similarity of the legal and remedial theories behind the plaintiffs' claims.  *Jenkins*, 782 F.2d at 472; *see* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3-13, at 3-76 (3d ed. 1992) ("[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.").  One of the purposes of the typicality requirement is to ensure that the representative's interest is "aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996); *see also In re Ford Motor Co. Bronco II*, 177 F.R.D. 360, 366-67 (E.D. La. 1997) (noting that purpose of typicality element is to ensure that interests of absent class members are

13

protected).

Rule 23(a) also requires that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement "is ultimately designed to protect members' due process rights, to keep them from being bound *in absentia* by someone who does not adequately protect their interests." *In re Asbestos Litigation*, 134 F.3d 668, 676 (5th Cir. 1998).  As with the typicality requirement, this element requires that the interests of the named plaintiffs are aligned with the unnamed class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members. *See Amchem*, 521 U.S. at 626 n.20 ("The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'") (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Because the Court finds that the proposed class fails to satisfy the predominance and superiority requirements of Rule 23(b)(3), it is unnecessary to decide the typicality and adequacy

14

of representation issues.

**C.    Rule 23(b)(3)**

In order to gain class certification under Rule 23(b)(3), "[c]ommon questions must 'predominate over any questions affecting only individual members'[,] and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3)).  The Court finds that class certification is not appropriate because plaintiffs have not met their burden of establishing either the predominance or superiority prong of Rule 23(b)(3).

1.    <u>Predominance</u>

The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class were certified." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).  This inquiry "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id.* "The predominance requirement of Rule 23(b)(3), though redolent

15

of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Amchem*, 521 U.S. at 623-24.

The Court acknowledges that, at a high level of generality, plaintiffs' motion for class certification identifies common issues, such whether the fees charged for various services by the parishes can be "bundled" together in a single charge that does not identify all the services allegedly performed or the amounts allegedly charged for each specific service.  It is not sufficient, however, that common questions merely exist.  7AA C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1778 (3d ed. 2005).  Upon inspection of plaintiffs' claims, the Court finds that individual issues predominate.

First, despite plaintiffs' attempt to certify a multi-parish class, there is little uniformity across parishes.  Plaintiffs set out nine categories of charges to be considered on a class-wide basis:  (1) filing charges, (2) copying charges, (3) citation charges, (4) subpoena and subpoena duces tectum charges, (5) minutes entry charges, (6) recording charges, (7) certified copy charges, (8) conformed copy charges, and (9) improper calculation of increases allowed under La. R.S. 13:841(C) and/or

(D).[19]  The categorizations of these charges, however, are overly broad and include different types of charges, in different amounts, across the parishes.  For example, the East Baton Rouge clerk charged plaintiff Della Gatzke $26.20 for filing a pretrial order and $6.00 for filing a case management schedule.[20]  Gatzke asserts that she was overcharged in both instances, while the clerk argues that he could have charged even more than he actually did when recording and copying services are considered. By contrast, plaintiff Latiya Smith argues that the Tangipahoa Parish clerk overcharged her for eleven different filings, which included a $12.00 charge for filing a petition and another $12.00 charge for filing a motion to stay.[21]  It is apparent that the filing category alone cannot be treated as a single charge, as it includes charges of various amounts for filing many different types of documents.

Moreover, the individual parishes employed distinct policies – a point explicitly acknowledged by Edward Sherman, an attorney currently representing plaintiffs.[22]  Although plaintiffs assert

---

[19]   (R. Doc. 579-1 at 2.)

[20]   (R. Doc. 527-5 at 13.)

[21]   (R. Doc. 529, Ex. 3.)

[22]   (R. Doc. 598-1, Ex. C at 15.)

that the clerks in each parish use costs codes that ensure uniformity of charges to the *entire class* for each of the categories of charges,[23] the cost sheets that the plaintiffs submitted reveal that there is not a uniform system of codes across the parishes.  In other words, a liability determination would require examination of the accounting systems and practices of each individual parish.

Even if the charging practices were uniform, the named plaintiffs do not challenge the same charges in their actions against the individual parishes, and no plaintiff alleges that he or she was improperly assessed all nine of the charges that plaintiff identify.  Plaintiff Della Gatzke's action against East Baton Rouge Parish, for instance, does not address that parish's practices regarding citation charges in excess of those allowed by La. R.S. 13:841(A)(6)-(7).[24]  By contrast, Smith challenges Tangipahoa's citation practices but does not challenge charges for subpoenas and subpoenas duces tectum charges under La. R.S. 13:841(A)(24)-(27).[25]  Thus, to the degree that plaintiffs intend to challenge all nine charges, it is evident that this case

---

[23]    (R. Doc. 579-1 at 12-13.)

[24]    (R. Doc. 584.)

[25]    (R. Doc. 529.)

18

cannot be litigated on a class-wide basis, as there is not a named plaintiff for each parish who alleges an injury from each of the charges.  Establishing liability with regard to one parish would not establish class-wide liability, because, as discussed above, the charging practices differ across parishes. Accordingly, litigating plaintiffs' claims would require a minimum of seven separate mini-trials, one for each parish.

Within the separate parishes, the parties also raise issues that cannot be litigated on a class-wide basis, because liability depends on questions particular to individual litigants.  The most pervasive example relates to defendants' claim that, in order to maintain a cause of action, a litigant must have actually paid the charges that were assessed to him or her.[26] Determining whether a particular class member paid the charges assessed would require a detailed examination of each litigant's case.  For instance, in her suit against the Beauregard Parish clerk, plaintiff Jennifer Guillory's contends that she "ultimately paid much of the court costs" in *Alex Guillory v. Jennifer Guillory*, 36th JDC, No. 2002-0185.[27]  She concedes, however, that it is "difficult to tell from the Clerk's records

---

[26]   (R. Doc. 561; R. Doc. 595; R. Doc. 589.)

[27]   (R. Doc. 575-1 at 16.)

what plaintiff paid for and what is left owed, if anything"
because the clerk did not apply a particular party's deposit to
that party's costs, but rather applied all deposits to all costs.
Guillory also argues that she is responsible for fees beyond
those she actually paid because the judgment in that case
provided that court costs were to be divided between the parties.
She further claims that she "indirectly" paid the court costs
assessed in *Bank One, N.A., et al. v. Alex David Guillory, Jr.
and Jennifer Joan Semien Guillory*, 36th JDC, No. 2003-0710.[28]
While the fees in that collection proceeding were initially paid
by Bank One, Guillory argues that she ultimately paid the fees
that the clerk collected out of the proceeds of the sheriff's
sale of the property at issue.

Similarly, plaintiff Conran Fricke acknowledged at his
deposition that, in his litigation in Jefferson Parish, his
attorney paid his court costs in full, that the attorney was
never reimbursed, and that he had suffered no damages as a result
of Jefferson Parish's alleged overcharges.[29]  Fricke's
acknowledgment illustrates that – assuming the defendants are
correct that establishment of liability requires proof of actual

---

[28]    (R. Doc. 575-1 at 23.)

[29]    (R. Doc. 582-4, Ex. 3 at 10-11, 15.)

damages – determining whether a class member can establish liability would require the Court to consider individualized evidence of each litigant's payment history.

The Court would also be required to determine whether a particular class member proceeded *in forma pauperis*, and, if so, at what point during the litigation the class member took on pauper status.  For example, Smith's account in Tangipahoa Parish was deducted for charges at the beginning of her litigation.  Yet, Smith filed a motion to proceed *in forma pauperis* on February 2, 2005.  Her cost sheet indicates that, after that date, the charges assessed to her were "Payable – Not Paid."[30]  Accordingly, determining whether a particular class member could maintain a cause of action for a particular charge would depend not only on *whether* that person proceeded *in forma pauperis* but also *when* during the course of the litigation that the class member ceased paying the charges assessed by the parish.

The plaintiffs also raise questions as to whether their charges were appropriate given the nature of the filings in their individual cases.  For example, Smith argues that the Tangipahoa Parish clerk violated the statute by charging her a fee for filing certain exhibits.  According to Smith, those exhibits were

---

[30]     (R. Doc. 529-3 at 74-75.)

submitted along with a motion, and thus should not have been treated as if they were separately filed.[31]  She also argues that the clerk improperly charged her for "two certified copies for service."  Smith claims that those copies were unnecessary because "[t]he testimony established that no copies had to be made as copies were provided by counsel."[32]  Resolving such claims would require information about the circumstances surrounding each particular filing.

Further, as demonstrated by plaintiff Karen Woodard's claims against Calcasieu Parish, there are fact-specific questions as to whether the clerks in each parish actually performed the services for which they charged for each litigant.  Woodard claims that – even though the total amount for what the clerk *could* have charged may have exceeded the actual expenses incurred, the clerk violated the statute by charging for services that it did not, in fact, perform.[33]  Accordingly, because the authorized charges would depend on what tasks each clerk carried out for each class member, liability for an overcharge could not be determined on a class-wide basis.

---

[31]     (R. Doc. 536 at 12.)

[32]     (*Id.* at 16.)

[33]     (R. Doc. 559 at 5-6.)

22

Plaintiffs also allege that the parishes overcharged under statutory sections that authorize specific charges based on the number of words in a particular document.  For example, La. R.S. 13:841(A)(5) authorizes a charge "[f]or copying all instruments of writing or pleadings not otherwise provided for" of two dollars per one hundred words.  Similarly, La. R.S. 13:841(A)(62) permits a charge of one dollar for each hundred words "for recording all acts."  Thus, the inquiry into whether a particular parish violated these subsections of the statute cannot be determined on a class wide basis; it would require literally counting words in the relevant documents in each class member's file and comparing the charge authorized by the statute with the charge that was actually assessed.

Finally, because plaintiffs challenge a wide variety of different statutory provisions, this case is unlike the typical situation in which courts have found that common issues predominate under Rule 23(b)(3).  This case is unlike, for example, an antitrust class action challenging a single conspiracy involving a single product or practice, *see, e.g.*, *In re Ins. Brokerage Antitrust* Litigation, 579 F.3d 241, 265-70 (3d Cir. 2009) (finding predominance where "plaintiffs' theory for proving antitrust injury would apply to all of the class members"); *In Visa Check/MasterMoney Antitrust Litigation*, 280

F.3d 124, 136-40 (2d Cir. 2001) (finding no abuse of discretion in the district court's conclusion that common issues predominated given the existence of a formula for calculating overcharges resulting from a credit card companies' practice of "tying" merchants' acceptance of credit cards and check cards together through their "honor all cards" rule), *superceded by statute on other grounds as recognized in Attenborough v. Const. and Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006), or a securities class action that challenges deceptive practices arising out of the sale of a single stock, *see, e.g.*, *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 477 (9th Cir. 1976) (holding that the question of whether the defendant withheld material information related to the sale of stock predominated over common issues). Instead, plaintiffs have launched an omnibus attack on the charging of fees under a 77-part statute across seven parishes. And, because the individual named plaintiffs do not uniformly challenge all nine of the charges that plaintiffs identify as improper under the statute, the Court would be required to sort through which class members have brought which claims against each of the parishes.

The individualized issues discussed here highlight that each case takes its own path through the legal system. Many more individual issues could present themselves when considering the

court costs for all of the cases in these parishes for each potential class member.  Even assuming that liability could somehow be established on a class-wide basis, determining each class member's damages would involve many of the same individualized questions, as the amount of damages is inherently related to whether and how much each class member was charged in excess of the statute.  Contrary to plaintiffs' claims that proof of overcharges would involve a simple comparison of the amount charged with what Louisiana law allows,[34] it is evident that the ultimate determination of liability and damages for each class member would require a detailed, file-by-file examination of his or her litigation in the relevant parish.

The difficulty of litigating plaintiffs' claims on a class-wide basis is underscored by the size of the class that plaintiffs seek to certify, which includes all civil litigants across the seven parishes for over 10 years.  The Court notes that it has not yet ruled on whether plaintiffs can maintain causes of action for the 10-year period that they propose.  Yet, even a one-year class would constitute a large number of class members.  In an earlier motion for class certification, plaintiffs represented that there are over 55,000 new civil

---

[34]     (R. Doc. 579-1 at 13.)

actions filed across the seven parishes every year.[35]  Given that the Court would be required to make a number of legal determinations specific to each class member, a class of comparable size would present considerable manageability problems.  *Compare White v. Imperial Adjustment Corp.*, 2002 WL 1809084, *16 (E.D. La. 2002) (explaining that common issues predominate, in part, because "[t]he potential class members number less than 200 *in toto*").

The Fifth Circuit has indicated that the existence of issues that must be resolved individually for a large number of class members makes class certification inappropriate.  For instance, in *Robinson v. Texas Automobile Dealers Association*, 387 F.3d 416 (2004), plaintiffs alleged that Texas car dealerships engaged in horizontal price fixing by imposing the Texas Vehicle Inventory Tax (VIT) as a line item on each car sales contract and attempted to certify a class including every purchaser who paid the VIT. In reversing the district court's certification of the class, the Fifth Circuit explained that plaintiffs had not met the predominance requirement because establishing the "fact of damage" for the potential class members would require the court to "hear evidence regarding *each purported class member and his*

---

[35]     (R. Doc. 338-1 at 9-10.)

*transaction.*"  *Id.* at 424.  Likewise, in *Moldonado v. Ochsner Clinic Foundation*, 493 F.3d 521 (2007), the Fifth Circuit held that common issues did not predominate because establishing whether class members had been overcharged for medical fees would depend on the particular circumstances of a patient's care and financial circumstances.  *Id.* at 525-26.  The same reasoning applies here.

Given the significant differences in charging practices across parishes, the breadth of plaintiffs' claims, the individualized nature of the inquiry that would be required to resolve them, and the large number of potential class members, the Court finds that plaintiffs have not met their burden of establishing predominance.


2.  <u>Superiority</u>

"A court's inquiry into superiority 'requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 630-31 (5th Cir. 1999) (quoting *Allison*, 151 F.3d at 419).  It may not certify a class without first considering how a trial on the alleged causes of action would be tried.  *Id.* (citing *Castano*, 84 F.3d at 751).

In response to an earlier motion for class certification,

which was denied as moot, the Court gave plaintiffs "one last chance – to do this right."[36]  The Court instructed plaintiffs to submit a trial plain along with the motion, "detailing how plaintiffs propose to try the case if the Court does certify the proposed class, including a plan for trying liability and damages."[37]  The Court further stated that, "[i]f plaintiffs propose to appoint a special master, they shall specify what the master will do."[38]  With regard to notice to potential class members, the Court instructed that "the motion shall include a sample of the proposed notice to class members and shall contain a specific and detailed plan for directing notice to the members of the putative class."[39]  Upon review of plaintiffs' trial and notice plans, the Court finds that plaintiffs have not established that class resolution is a superior method of resolving their claims.

      *a.   Trial Plan*

Although submission of a workable trial plan is not a

---

[36]   (R. Doc. 598-1 at 69.)

[37]   (R. Doc. 495 at 2.)

[38]   (*Id.*)

[39]   (*Id.*)

prerequisite for a finding of superiority, *Feder v. Electronic Data Systems Corporation*, 429 F.3d 125, 139 (5th Cir. 2005), in order to certify a class, a district court must possess sufficient information regarding "how a trial on the alleged causes of action would be tried." *Mullen*, 186 F.3d at 631 (quoting *Castano*, 84 F.3d at 752); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009) (recommending that district courts make it a "usual practice" to direct plaintiffs to present feasible trial plans to establish superiority); Fed. R. Civ. P. 23 Advisory Committee's Note, 2003 Amendments ("An increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof.") (citing *Manual For Complex Litigation Third*, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215).

In the instant motion for class certification, plaintiffs have proposed the following four-step trial plan:  Step one consists of plaintiffs' various motions for summary judgment pending before the Court, which plaintiffs "anticipate . . . will resolve the propriety of many of the charges at issue."[40]  Step

---

[40]    (R. Doc. 579-1 at 15-16.)

two encompasses a "classwide trial" on the issues not decided through summary judgment.[41]  Plaintiffs state that they "would present evidence in a classwide trial to show where the practices related to each clerk's charges based on their respective schedules of fees uniformly violate the listed sections of La. R.S. 13:841 and do not vary among individual class members."[42]

Stage three calls for a determination of plaintiffs' claims for injunctive relief following the completion of the classwide trial.[43]  Plaintiffs ask the Court to enjoin defendants from collecting court fees in excess of the statutory maximum. Plaintiffs also seek an injunction requiring defendants to notify class members of any liability resulting from the trial, which plaintiffs claim will ensure that class members are informed of the fees they were charged and allowed to file a damages claim.

Finally, at stage four, plaintiffs propose that the Court appoint a special master or a claims administration company to determine damages for the proposed class members.[44]  They claim that, because the determination of damages, or "Claims Process,"

---

[41]   (*Id.* at 16.)

[42]   (*Id.*)

[43]   (*Id.* at 17.)

[44]   (*Id.* at 17–18.)

30

will occur after a finding of liability, the cost should be borne by defendants.[45]  Plaintiffs insist that the Claims Process will be ministerial in nature, because "[t]he claims administrator will only have to refer to the jury's findings as to whether and how much the uniform district charge for each category exceeded the statutory authority and then, based on the costs sheets, add up the overcharges for the charges made for all the categories on the individual claimant's list of charges."[46]

The Court finds plaintiffs' trial plan inadequate and that plaintiffs have thus failed to establish that class resolution is superior to other available methods for the fair and efficient adjudication of the controversy.  As discussed above with regard to predominance, given the differences in charging practices across parishes – and that the individual named plaintiffs do not contest all nine of the charges that plaintiffs identify – establishing liability for each potential class member would require at least seven different mini-trials.  Plaintiffs seem to acknowledge this difficulty by identifying seven separate subclasses, one for each of the parishes, but they make no attempt whatsoever in their trial plan to explain the specific

---

[45]    (*Id.* at 17.)

[46]    (*Id.* at 18-19.)

issues or evidence relevant to each subclass.

Moreover, although various individualized questions must be resolved to establish liability for each class member – such as whether a class member actually paid the fees assessed by the parish, or whether the clerk in a particular parish, in fact, performed the work for which the class member was charged – plaintiffs have provided no guidance as what factual inquiries must be made at trial.  Instead, plaintiffs assert that the trier of fact "can resolve any remaining factual disputes," without identifying what those specific factual disputes may be.  By failing to provide specifics as to how a trial on the merits would be conducted, plaintiffs appear to adopt the sort of "figure-it-out-as-we-go-along approach" that the Fifth Circuit has squarely rejected.  *Robinson*, 387 F.3d at 425 (reversing class certification because the district court had not adequately considered administration of trial in finding that a proposed class action met the superiority requirement).  Because plaintiffs "present no sensible way to resolve the dispute on a class-wide basis," *Moldonado*, 493 F.3d at 525, they have not met their burden of establishing superiority.

The Court further finds that plaintiffs' trial plan is unworkable with respect to damages.  Plaintiffs contend that damages could be determined through a "ministerial calculation"

by a special master or claims administration company, which would "make a mechanical determination of the amount of overcharges based on the findings in either summary judgment or trial, and authorize a refund for that amount to any person qualifying for one."[47]  As an initial matter, the Court notes that use of a claims administration company in this case would be improper. Claims administration companies have been used in settlement classes to determine individual damages *after* a defendant has agreed to the size of a settlement and the outlines of the claims administration process.  *See, e.g., In re OCA, Inc. Securities & Derivative Litigation*, 2008 WL 4681369, *17 (E.D. La. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d. 830, 854 (E.D. La. 2007); *In re Engineering Animation Securities Litigation*, 203 F.R.D. 417, 420 & n.12, 424 (S.D. Iowa 2001).  Plaintiffs suggest, however, that a claims administration company could make the conclusive determination as to which claims the defendants would be required to pay and the size of the resulting damages. Plaintiffs provide no authority – and the Court is aware of none – that would permit a private company to perform such an adjudicatory function.  Noticeably absent from plaintiffs' discussion is any avenue for the defendants or the individual

---

[47]     (R. Doc. 579-1 at 17.)

33

plaintiffs to object to the private company's determinations or for the Court to review any such objections.

With regard to the appointment of a special master, plaintiffs provide no detail as to what qualifications the master must have to be appointed to determine damages in this complex case. Nor do they provide any specifics regarding how the process for determining damages would vary across parishes or for individual members of the proposed class, or when and how the defendants or the individual plaintiffs would be permitted to object to the master's conclusions. *Compare In re OCA*, 2008 WL 4681369 at *17 (certifying a settlement class where plaintiffs had identified a specific claims administrator with extensive experience and had provided a detailed plan for administration of the settlement). Plaintiffs' description of the damages calculations as "ministerial" obscures the considerable difficulty that would be involved in such a process. Use of a special master is appropriate "when liability has been determined in favor of the class *and* a formula for individual proof of damages has been established that is capable of being uniformly applied." 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 9:55 (4th ed. 2002); *see also Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 589 (10th Cir. 1961) (approving of the district court's appointment of a special master where the

34

"master serves only to assess the amount of individual damages, based upon the formulae stated in the verdict and appellants' own records").  Plaintiffs have provided no such formula that would suggest damages could be uniformly calculated by a special master after a finding of liability.

As discussed above, plaintiffs' challenges to the parish practices raise a number of issues that are specific to each parish and to each individual litigant.  The special master would have to assess multiple fees of various types paid during the pendency of a case with different liability determinations depending upon the charge and the parish.  In order to determine whether a particular class member actually paid some or all of the fees that were assessed, the special master would be required to examine related cases in which the class member was involved as well as the class member's relationship to other parties in the litigation, as illustrated by plaintiff Guillory's claims against Beauregard Parish.  The special master would also have to make determinations as to timing of pauper status in individual cases.  In addition, with regard to damages resulting from plaintiffs' challenges to several of the challenged charges – such as La. Rev. Stat. § 18:841(5) – the special master would literally be required to count words, as the statutes permitted a fee of a certain amount for each hundred words in the relevant

document.  These separate difficulties are compounded by the size of plaintiffs' proposed class.

In support of their trial plan for damages, plaintiffs cite *White v. Imperial Adjustment Corporation*, 2002 WL 1809084 (E.D. La. 2008), in which the court certified a class, in part, because "[m]ost of what is required to determine liability . . . as well as much of what is required to determine the damage amounts, may be discerned from the defendants' records." *Id.* at *16.  In *White*, however, the court specifically noted the lack of manageability problems related to the proposed class. Specifically, the court explained that the plaintiff asserted a single claim for the violation of one federal statute and that the proposed class numbered less than 200.  *Id.*  Unlike *White*, the proposed class in this case includes potentially hundreds of thousands of individual members, and the calculation of damages would be different depending on the particular practices of the parishes and the individual variations among class members. Although such an endeavor may be possible, plaintiffs have not provided a workable explanation of how that process would unfold if the class were certified.

Finally, plaintiffs incorrectly presume that the costs of the Claims Process would necessarily be borne by the defendants

"[s]ince this process will occur after a finding of liability."[48]
Federal Rule of Civil Procedure 53(g)(3), which addresses
allocation of payment to a special master, provides:

> The court must allocate payment among the parties after
> considering the nature and amount of the controversy, the
> parties' means, and the extent to which any party is more
> responsible than other parties for the reference to a
> master.  An interim allocation may be amended to reflect a
> decision on the merits.

Plaintiffs do not address the relevant concerns articulated in
Rule 53(g)(3), and this lack of specificity supports the Court's
conclusion that plaintiffs's trial plan is inadequate.

Given the paucity of the information in the proposed trial
plan and the concerns about the calculation of any possible
damages, plaintiffs have not met their burden of establishing
that the class action is a superior method for litigating their
claims.  *Cf. Pella Corporation v. Saltzman*, 606 F.3d 391 (7th
Cir. 2010) (affirming the district court's decision to certify a
class where "the district court judge had before him hundreds of
pages of legal briefing, as well of hundreds of pages of
documents, deposition transcripts, and expert reports"); *see also
Trecker v. Manning Implement, Inc.*, 73 F.R.D. 554, 564 (N.D. Iowa
1976) (concluding that the proposed class action did not meet the
superiority requirement because each class member's damages would

---

[48]     (R. Doc. 579-1 at 17.)

have to be established by "wading through" thousands of invoices and because the damage inquiry would trigger an evaluation of whether each separate member of the class was, in fact, injured).

       *b.   Notice Plan*

"Among the factors to be considered in determining whether Rule 23(b)(3)'s superiority requirement is satisfied are 'the difficulties likely to be encountered in the management of a class action.'" *Regents of Univ. of Calif. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 404 n.15 (5th Cir. 2007) (Dennis, J., concurring) (quoting Fed. R. Civ. P. 23(b)(3)).  In determining whether a proposed class is manageable, the Court must consider, *inter alia*, the onerousness of providing constitutionally sufficient notice.  *See* 7AA C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1780 (3d ed. 2005) (listing concerns that bear on the severity of management problems); *see also Simer v. Rios*, 661 F.2d 665, 677-78 (7th Cir. 1981) ("The problems of the individual issues of . . . identifying the class members lead us to conclude that use of the class action device would have been unmanageable.").  When class representatives propose a constitutionally inadequate method for notice, class certification is inappropriate.  *See, e.g., Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 179 (1974) (remanding

38

with instructions to dismiss the proposed class action because plaintiffs were unwilling to bear the burden of providing constitutionally sufficient notice); *Lawson v. Brown*, 349 F. Supp. 203, 209 (W.D. Va. 1972) (denying class certification because of the impracticality of giving adequate notice); *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549, 553 (S.D.N.Y. 1972) (noting, as part of the court's manageability analysis, that the proposed class had not been identified or notified).

Rule 23(c)(2) makes notice mandatory for Rule 23(b)(3) actions, requiring "the best notice practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). The Supreme Court, in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), held that subdivision (c)(2) expresses an "unambiguous requirement" that "individual notice must be provided to those class members who are identifiable through reasonable effort." *Id.* at 175. "This approach, which comports with due process standards and facilitates the class actions' *res judicata* effect, demands that absentee class members be provided with the "'maximum opportunity for notice.'" *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1097 (5th Cir. 1977) (quoting *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 829-31 (3d Cir. 1973)). The Fifth Circuit has explained that the type of notice to which a member

of a class is entitled depends upon the information available to the parties about that person, and "[t]he source or sources providing the greatest number of names and addresses must be used." *In re Nissan*, 552 F.2d at 1098-99.  Although the word "reasonable" in Rule 23(c)(2) cannot be ignored, "a search, even though calculated to reveal partial information or identification, may be omitted only if its cost will exceed the anticipated benefits." *Id.*  Even when the effort necessary to identify class members "may prove to be expensive and time-consuming," the individual right of absentee class members to due process typically makes the cost and effort reasonable. *Id.*

In denying plaintiffs' earlier motion for class certification as moot, the Court directed plaintiffs to provide a specific and detailed plan for directing notice to members of the putative class.[49]  As part of their notice plan, plaintiffs contend that individual notice is not required in this case because not all potential class members are identifiable through reasonable effort.  Based on the defendants' assertion in a earlier motion before the Court that the names and addresses of potential class members are not readily available in defendants'

---

[49]    (R. Doc. 475 at 2.)

records,[50] plaintiffs propose to provide direct mail notice to

*pro se* litigants only and, for all other litigants, to provide

notice to the attorneys who represented these litigants in the

various parish courts.[51]  Plaintiffs contend that the attorneys

could then forward notice to potential class members on the

plaintiffs' behalf.[52]  To effectuate this notice plan, plaintiffs

propose that

> mailed notice be in the form of a letter from the court with
> a request that the attorneys either provide counsel for the
> plaintiffs with the addresses of the litigants or request a
> sufficient number of postage prepaid (through a permit)
> notices to send to their clients who may be class members.[53]

Plaintiffs explain that, prior to mailing notice, "efforts would

be undertaken" to update the addresses of the attorneys, and that

plaintiffs would maintain a record of all returned mail in order

to attempt another mailing if the first attempt were to be

returned due to a change of address.[54]  In addition, plaintiffs

suggest that a website be established and that a court-approved

---

[50]   (R. Doc. 346 at 22.)

[51]   (R. Doc. 579-1 at 20-21.)

[52]   (*Id.*)

[53]   (*Id.* at 20.)

[54]   (*Id.* at 21.)

press release be issued "to wire services such as PRNnewswire."[55] Plaintiffs suggest that, should notice not be achieved through the above-described means "as evidenced by the return of mailed notice, which could not be resent or otherwise achieved [*sic*] by means the court orders, . . . the court deem those litigants as opt outs not bound by the settlement [*sic*]."[56]

In support of their notice plan, plaintiffs provide the affidavit of notice expert Todd Hilsee.[57]  Hilsee states that, in this instance, "notice to and through the Litigants' Lawyers, who represent or have represented the litigants' interests, provides the next best method of providing individual notice."[58]  Hilsee notes, however, that "caution must be taken with any 'last known addresses' found in court records" because a last known address may not represent the current address, especially in light of increased mobility from the aftermath of Hurricane Katrina, and

---

[55]    (*Id.*)

[56]    (*Id.*)

[57]    (R. Doc. 579-4, Ex. 9.)  The Court recognizes that defendants have submitted a motion *in limine* to exclude Hilsee's affidavit.  (R. Doc. 593.)  Because the Court determines that plaintiffs' have not submitted a workable notice plan, even as supplemented by Hilsee's affidavit, the issue is moot and Court does not address the merits of defendants' motion.

[58]    (*Id.* at 3.)

"[a]ddress-updating efforts must therefore be adopted."[59]

Hilsee analogizes the proposed notice to the notice provided in securities fraud class actions, where the names of beneficial holders of stock is unknown, and only the "street name," which lists the name and address of the beneficial holder's broker, is available:  "In securities matters, the broker is asked to distribute the notice to the shareholders, or alternatively, to provide to counsel or an administrator the names and addresses of the shareholders of record during the class period for the security in question."[60]  Although Hilsee acknowledges that the standard practice is to allow for reimbursement for the broker's costs of postage and photocopying, he opines that such reimbursement would not be necessary in this case.  Hilsee further opines that, even if the Court were to decide reimbursement were necessary, "the standard practice does *not* pay for research time, and there will be no postage expense on the Litigants' Lawyers part under the approach contemplated."[61]

The Court finds that plaintiffs' notice plan is inadequate in several respects.  First, Hilsee's affidavit was previously

---

[59]     (*Id.* at 3-4.)

[60]     (*Id.* at 5.)

[61]     (*Id.*)

submitted along with plaintiffs' March 17, 2010 motion for class certification.[62]   Since then, plaintiffs have substantially expanded the definition of the proposed class.   The earlier motion sought class certification for litigants in Calcasieu Parish from November 13, 2002 to August 15, 2006 and for litigants in the other six parishes from August 15, 2003 to August 15, 2006.[63]   In the instant motion, plaintiffs include civil litigants in Calcasieu Parish back to November 13, 1992 and civil litigants in the other parishes back to September 22, 1995. Because Hilsee addressed notice for only the earlier, significantly smaller proposed class, his conclusions are inapplicable with regard to the class that plaintiffs now seek to certify.   Plaintiffs have provided no support for their contention that adequate notice could be provided to the new, expanded proposed class.

Moreover, although plaintiffs say that they will "initially" bear the costs of notice, plaintiffs notice plan is opaque as to exactly who would be responsible for various steps in the notification process and what these steps would entail.   The plaintiffs' failure to inform the Court as to who would do what

---

[62]   (R. Doc. 486.)

[63]   (R. Doc. 486 at 1.)

under their plan demonstrates that plaintiffs have not thought through how the notice plan would function.  Yet, by now, one thing is clear:  except for postage, plaintiffs do not intend to bear the burden or cost of identifying or notifying potential class members themselves – a point plaintiffs' counsel admitted at the hearing – but instead wish to shift the burden to the defendants or the third-party attorneys.

In *Eisen*, the Supreme Court explained that when, as here, "the relationship between the parties is truly adversary, the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit."  417 U.S. at 179; *see also* Wright, Miller & Cane, *supra*, § 1788 (explaining that, after *Eisen*, "it is [ ] clear that all notice costs must be borne by the plaintiffs"); 3 Conte & Newberg, *supra*, § 8:6 ("Plaintiffs' representatives are normally liable for the financing of Rule 23(c)(2) notice in the first instance.").  The Supreme Court has also indicated that "the general rule" is that particular tasks necessary to send the proposed class notice should be performed by the plaintiff.  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356-57 (1978).  Only when the defendant may be able to perform a necessary task with less difficulty or expense than the plaintiff should the Court require defendants to perform a task related to notice.  *See id.* (citing *Nissan*, 552 F.2d at 1102

45

(finding that "[n]o peculiar circumstances exist which would warrant a departure from [the] general rule" that "class representatives must be prepared to accept the concomitant responsibility of identifying absentee class members as well as paying the costs of their individual notice")).  In that case, when the expense is substantial, courts should still typically direct plaintiffs to pay the defendants' costs.  *See Oppenheimer*, 437 U.S. at 358 ("[W]e caution that courts must not stray too far from the principle underlying *Eisen*[] that the representative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action.").

At the class certification hearing, plaintiffs allowed that they would actually require the defendants to identify *pro se* litigants, as well as the attorneys representing litigants in each parish during the relevant period, all without any reimbursement of costs.  By shifting the cost of identifying class members to the defendants, implementation of plaintiffs' notice plan would violate the Supreme Court's holding in *Eisen,* especially given that plaintiffs have not shown what exactly would be involved in compiling the relevant information by the parishes or that compiling this information would be substantially less difficult for defendants than it would be for

46

plaintiffs.  *See Oppenheimer*, 437 U.S. at 357-58.  To the contrary, defendants plausibly argue that compiling "exhaustive lists will be an extreme undertaking requiring an enormous amount of man hours and substantial cost, even more so in the offices of Clerks . . . in which the data is not in electronic format."[64] Indeed, the defendants point out that, in at least some and perhaps all of the parishes, a manual examination of each litigant's file would be necessary to one degree or another. Plaintiffs have not shown how an effort of that nature would be easier for defendants than it would be for a team of paralegals provided at plaintiffs' expense.  It would be different if plaintiffs could show that the issue involved simply pressing a button to generate a computerized list with the relevant information, but they have not done so.  As plaintiffs have not proposed to pay for defendants' efforts, have not shown that sifting through all of these records is any easier for defendants than for themselves, and have not expressed any willingness to compile the lists, they have failed to provide a workable notice plan.

Further, although plaintiffs acknowledge that "efforts would be undertaken" to update the addresses of both *pro se* litigants

---

[64]     (R. Doc. 598 at 23.)

and the attorneys listed in the defendants' records, plaintiffs do not specify whether they or defendants would provide the resources to verify these addresses under the notice plan.  Nor does Hilsee provide this information in his affidavit, even though he acknowledges that "caution must be taken with any 'last known address' found in court records, even the Litigants' Lawyers."[65]  He states only that "[a]ddress-updating efforts must therefore be adopted."[66]  In the absence of more detail, the plaintiffs have not established that they are willing to bear the burden of adequately notifying potential class members as required by *Eisen*.  *See* 417 U.S. at 179.

Plaintiffs' notice plan also fails to explain exactly what tasks the attorneys who represented potential class members would perform.  At one point in the class certification hearing, plaintiffs' counsel suggested that defendants would simply supply a list of attorneys who had cases in their parishes during the relevant period and the attorneys would then be required to search their files for the names of the litigants they represented in the seven parishes during that time.  Under this scenario, almost the entire burden of identifying class members,

---

[65]    (R. Doc. 579-4 at 3.)

[66]    (*Id.* at 4.)

supplying addresses, and providing notice would fall on these third-party attorneys. Another member of plaintiffs' legal team, however, suggested that defendants would have to generate a list of cases pending during the relevant period and, from there, identify the attorneys appearing for any of the parties, so that the attorneys could be given a case name as a reference to search for names and addresses of clients. Regardless, the attorneys would have to search their records either for the cases and clients in seven parishes or for all of their clients in the identified cases for potentially a 10-year period. Although the task would be less burdensome if the attorneys were given case names for reference, either way, the plan would place burdens on these third-parties (especially on those who practice regularly in one or more of the parishes) without any reimbursement of administrative costs.

In the securities fraud context, which Hilsee asserts is analogous to this case, courts have typically required that the class representative pay for the administrative and research costs surrounding notice to potential class members in order to ensure that the brokers do, in fact, forward notice. For example, in *In re Victor Technologies Securities Litigation*, 792 F.2d 862 (9th Cir. 1986), the plaintiffs proposed to provide only postage-paid copies of the notice to all record owners to forward

the notice to the beneficial owners of the relevant stock.  *Id.* at 863.  Relying on evidence submitted by the defendants that brokerage houses, as a matter of business practice, often do not forward notices unless they are reimbursed for administrative costs of searching their records, the district court concluded that plaintiffs were required to reimburse the brokerage houses for such costs in order to provide constitutionally sufficient notice.  On appeal, the Ninth Circuit affirmed the district court's order, holding that, in light of the evidence, the only effective means of notice required the plaintiffs to pay for the brokerage houses' administrative costs in advance.  *Id.* at 866 ("As the essentially undisputed facts demonstrate, notice sent to the record owners, accompanied by a request to forward, but refusing to compensate the record owner, is not 'reasonably certain to inform those affected.'") (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)).

Likewise, in *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992), representatives of a certified class provided notice to potential class members by mailing notice to brokerage houses with instructions to forward the notice to the beneficial owners of a certain stock.  *Id.* at 699.  The plaintiff, an owner of the beneficial stock who did not receive notice until after the opt-out deadline, brought suit alleging that notice was deficient.

50

Although the district court concluded that notice was the best practicable under the circumstances, the Ninth Circuit reversed. It held that, absent new evidence of improved technology, which "may have rendered search costs so insignificant as to render the notice given the 'best practicable,'" the class representatives were required, under *Victor*, to reimburse the brokerage houses for the costs of forwarding the notice *in addition to* providing postage-paid notices. *Id.* at 700-02. *See also Fidel*, 534 F.3d at 515 (concluding that a notice plan involving brokerage houses was reasonably calculated to reach interested parties where "all costs" were reimbursed by plaintiffs' counsel); *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 940 (10th Cir. 2005) (concluding that a settlement class involving beneficial holders of stock was provided with adequate notice where the settlement administrator was reimbursed for "[a]ny costs associated with the mailing . . . from the settlement fund"). Although Hilsee asserts that he does not believe "*any* form of reimbursement must be offered," the relevant case law belies that assertion. Given the large number of potential class members, the broad scope of the proposed class, and the undefined scope of the attorneys' undertaking, the burden and expense to third-party attorneys under plaintiffs' plan could be substantial. To the extent that plaintiffs' plan imposes such a

51

burden without offering compensation for research and
administrative costs, it would not provide notice "reasonably
certain to inform those affected."  *Eisen*, 417 U.S. at 174.

As noted above, plaintiffs have represented that a class
consisting of litigants from a single year across the seven
parishes would consist of over 55,000 members.  Of concern to the
Court is that plaintiffs may not be able to pay the attendant
costs of providing proper notice.  One of the firms representing
the plaintiffs in this case has recently filed for Chapter 11
bankruptcy protection[67] and has entered into an agreement with its
creditors limiting its client cost advances to $5,000.[68]  It thus
appears that plaintiffs' counsel may not have the resources to
provide constitutionally adequate notice to such a large number
of potential class members, even if the Court were to certify the
class, given that notice costs could run in the tens, if not
hundreds, of thousands of dollars.  *See, e.g.*, *In re OCA*, 2009 WL
512081 at *4 (approving a $175,000 payment from a settlement fund
for the cost of notice and administrative fees in a securities
class action); *see also generally In re Educational Testing PLT
7-12 Test Scoring Litigation*, No. 04-md-1643 (E.D. La. Dec. 30,

---

[67]    (R. Doc. 598-1, Ex. F.)

[68]    (R. Doc. 598-1, Ex. G.)

2008), ECF No. 363-2.

In addition, plaintiffs do not explain how adequate notice can be provided prior to the January 18, 2011 trial date.  In order to ensure that the rights of absentee class members are fully protected, "[c]ertification under Rule 23(b)(3) would require that the class members receive notice of the suit 'well *before* the merits of it are adjudicated.'"  *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 (11th Cir. 2000) (quoting *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995)); *see also* Wright, Miller & Cane, *supra*, § 1788 (highlighting timing as among the most important factors related to notice under Rule 23(c)(2)).  Yet, less than one month before trial, plaintiffs have not identified the potential class members or provided any indication of how the names and addresses could be verified within the remaining time.

Further, plaintiffs also fail to provide for a period after the mailing of notice in which potential class members could opt out of the class.  For Rule 23(b)(3) class actions, the ability to opt out of a class is a "fundamental requisite[s] of the constitutional guarantees of procedural due process."  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416-17 (5th Cir. 2004) (quoting *Eisen*, 417 U.S. at 174).  Although there is no absolute right to opt out, *Monumental Life*, 365 F.3d at 417, notice must

53

be mailed in sufficient time to provide potential class members
with a meaningful opportunity to be excluded from the class.  And
while Rule 23(c) is not specific as to how much time is required,
explaining only that notice must be provided "[a]t an early
practicable time after a person sues or is sued as a class
representative," courts addressing opt-out periods in the class
settlement context have typically held that between 30 and 60
days from the time of mailing is appropriate.  *See, e.g.*,
*Dejulius*, 429 F.3d at 840, 946-47 (approving of a 32-day opt-out
period); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75
(9th Cir. 1993) (approving of a 31-day opt-out period); *Fidel*,
534 F.3d at 514 (approving of a 46-day opt-out period); *see also*
3 Conte & Newberg, *supra*, § 8:37 (explaining that settlement
notices that require a proof of claim response show a range of
approximately 30-day to 180-day intervals, "with the bulk of
notices directing 30- to 60-day intervals between mailing or
publishing class notice and the filing of an affirmative response
by class members").  Absent details from plaintiffs as to how
class members could opt out in the remaining time before trial,
the Court finds that plaintiffs' notice plan is inadequate.

Instead of providing for an opt-out period, plaintiffs
assert that, should notice not be achieved through the proposed
notice plan for some potential class members, those persons

should be "deemed opt outs and not bound by the settlement."[69] Plaintiffs statement is somewhat strange, as no class settlement has been negotiated between the parties in this case.  Even so, plaintiffs' suggestion that the Court simply deem those litigants who do not receive notice as opt-outs is contrary to the general rule that litigants who wish to exclude themselves from the binding effect of class resolution must affirmatively request exclusion.  *See* 7AA Wright, Miller & Cane, *supra*, § 1789; *see also Berry Petroleum Co. v. Adams and Peck*, 518 F.2d 402, 412-13 (2d Cir. 1975), (holding that only the four persons who explicitly opted out of the class were not bound by the *res judicata* effect of the judgment), *abrogation on other grounds recognized in Menowitz v. Brown*, 991 F.2d 35 (2d Cir. 1993).  A contrary rule would unfairly subject defendants to future, similar claims and would relieve plaintiffs of their obligation to provide individual notice.  *Cf. Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1487 (D.C. Cir. 1992) ("A rule that allows a defendant's expectation in the finality of litigation to be disturbed when a class member's failure to receive notice is attributable to class counsel's putative negligence could well create a disincentive for future class

---

[69]    (R. Doc. 579-1 at 21.)

action defendants to enter into settlements.").

Nor have plaintiffs complied with the Court's order that they include a sample of the proposed notice to class members in their motion for class certification.[70]  Instead, plaintiffs rely on Hilsee's affidavit, which states his opinion that "the actual content [of the notice] should be developed upon certification, in order to communicate any particular information that the Class Certification Order may reflect, and it would be most efficient to proceed in that fashion."[71]  Hilsee's opinion, however, does not relieve plaintiffs of the obligation to comply with the Court's instructions.  Moreover, that plaintiffs have yet to determine the content of their proposed notice, which could involve considerable time and costs to develop, underscores the Court's concern that plaintiffs could not provide constitutionally sufficient notice to members of the proposed class in the short time remaining before trial.

Finally, the Court rejects plaintiffs' suggestion at oral argument – made in response to the Court's concerns about the details of their notice plan – that publication notice alone would be constitutionally adequate.  The Fifth Circuit has been

---

[70]     (R. Doc. 475 at 2.)

[71]     (R. Doc. 579-4.)

56

clear that, even when the cost of providing individual notice is high, publication notice is not sufficient to provide due process when the names and addresses of potential class members are known "or capable of being identified from business or public records available to them." *Nissan*, 552 F.2d at 1098 ("[T]he name and last known address of each class member known to the parties or capable of being identified from business or public records available to them must be produced."); *see also Eisen*, 417 U.S. at 174-75 (explaining that the Court has held that publication notice could not satisfy due process where the names and addresses of the recipients are known) (citing *Mullane*, 339 U.S. at 318). Plaintiffs do not contend that the names and addresses of the litigants are unknown or unavailable; they are simply unwilling or unable to bear the expense of compiling them.

Accordingly, because plaintiffs do not provide a workable notice plan, the Court finds that plaintiffs have not satisfied the superiority prong of Rule 23(b)(3).

**III. CONCLUSION**

For the reasons stated, plaintiffs' motion for class certification is DENIED.

New Orleans, Louisiana, this 30th day of December, 2010.

_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE